Filed 5/6/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S030553
      v. )
)
GEORGE BRETT WILLIAMS, )
)       Los Angeles County
      Defendant and Appellant. )       Super. Ct. No. TA006961
_____)

A Los Angeles County jury found defendant George Brett Williams guilty of two first degree murders and found true the special circumstance allegations of multiple murder and that the murders were committed while defendant was engaged in the commission or attempted commission of a robbery. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(3), (17).[1] The jury further found defendant guilty of two counts of second degree robbery and found true that defendant personally used a firearm in the commission of the felony offenses. (§§ 211, 12022.5.) After the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion for new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment.

---

[1]    Hereafter, undesignated statutory references are to the Penal Code.

## INTRODUCTION

On January 2, 1990, Willie Thomas and Jack Barron were fatally shot at close range in a house on Spring Street in Los Angeles. Their bodies were dragged to a truck parked in the garage, where they were found when the police arrived in response to a neighbor's call reporting gunshots. The prosecution's theory was that defendant shot both victims in the course of a robbery that had begun as a drug transaction. According to prosecution witnesses, earlier that evening defendant had planned to scam the victims through a fraudulent drug transaction at a bar parking lot by trading fake money for drugs. The victims met defendant at the bar parking lot, but, for reasons unknown, the transaction did not occur there. Instead, later that evening, the victims came to the Spring Street house, which was a frequent hangout for defendant and three associates. According to the testimony of the three associates, all of whom had pleaded guilty in prior proceedings, defendant shot both victims. Additionally, two neighbors to the Spring Street house testified that defendant was present at the house on the night of the killings. The prosecution presented evidence that the pager found at the scene of the crime was defendant's, and that his fingerprints were found in the room where the victims had been shot and on the truck to which the victims' bodies had been dragged. The prosecution also presented evidence that defendant fled Los Angeles after the shooting, and that, upon his return two weeks later, he sought to pay some new acquaintances to fabricate an alibi for him for the night of the killings.

# I. FACTS

## A. Guilt Phase

### 1. Prosecution Case

The prosecution presented evidence of the murders and the drug deal surrounding it largely through the testimony of two of defendant's accomplices, Patrick Linton and Dauras Cyprian.[2] Their testimony was corroborated by the testimony of other witnesses, telephone records, and physical evidence.

#### a. Background

Defendant socialized with Patrick Linton, Dauras Cyprian, and Dino Lee. This group often gathered at a house on Spring Street, where Cyprian's half brother, Ernie Pierre, lived.[3] On the upstairs floor of the house was a vacant small apartment, where victims Willie Thomas and Jack Barron were shot on January 2, 1990. Cyprian and his mother, Marcella Pierre, lived in a house across the street.

#### b. Preparations for the Drug Deal

In the week prior to the killings, defendant mentioned to Linton that he intended to "jack someone for some money," meaning that he intended to scam someone through a fraudulent drug deal. On the day of the killings, defendant was socializing with Linton and Cyprian at the Spring Street house. Defendant told Linton he was going to set up a drug deal with victims Jack Barron and Willie Thomas. Telephone records indicated that, on the day of the killings, three calls

---

**2**     Dino Lee, the third accomplice, did not testify for the prosecution, but was called by the defense. As summarized below in the defense case, Lee's testimony also incriminated defendant and was substantially the same as the testimony of Linton and Cyprian.

**3**     Ernie Pierre was not at home on the night of the murders and played no role in the case.

were made between defendant's house and an air conditioning business called A.R.A. Victims Barron and Thomas worked at A.R.A. Fellow A.R.A. employee Londell Richardson testified that, on the day of the killings, he overheard a telephone conversation by Thomas and Barron indicating that, after work, they were planning to go to a bar to transact a drug deal involving $50,000 and three or four kilos of cocaine.

In preparation for the drug transaction, defendant, Linton, and Cyprian went to defendant's house, where defendant assembled packages of torn-up phonebook pages, which he wrapped to resemble bundles of cash and then placed in a plastic bag. Defendant also brought three guns, which were later found at the scene of the crime, a .38-caliber Smith & Wesson revolver, a .380-caliber Titan automatic pistol, and a carbine rifle.

### c. Meeting at a Bar Parking Lot

Linton testified to the following events: Linton drove defendant and Cyprian in Linton's truck, a blue Chevy Blazer, to the parking lot of a bar. Defendant got out of the truck and went over to talk to Barron, whose truck was parked in the back of the lot. Thomas stood next to Barron's truck. Defendant spoke with the victims, Barron and Thomas, for 30 to 45 minutes.[4] Defendant returned to Linton's truck and told Linton that they were going to follow Barron and Thomas

---

[4] For the events at the bar, in addition to the testimony of Linton and Cyprian, the prosecution presented the testimony of Jose Pequeno, a former coworker of Barron's and Thomas's. Pequeno worked at the bar and was present that night. Pequeno identified Linton's Blazer as being there that night and identified defendant from a photographic lineup as the person who got out of the Blazer and talked with Barron and Thomas. Pequeno's in-court identification of defendant was more tentative; he stated that he "thought" defendant was the person who had talked to Barron and Thomas in the bar parking lot that night.

to a house in South Gate. Barron and Thomas drove out of the parking lot together in a blue Chevy Sprint, an A.R.A. company car that Thomas often drove. Defendant, Linton, and Cyprian followed the Sprint as far as the freeway, but defendant decided at the last moment not to follow it to the house in South Gate, and told Linton to drive instead back to defendant's house. There they dropped off the guns and the plastic bag of fake cash.

Cyprian gave a slightly different account than Linton of the events at the bar parking lot, testifying as follows: While he was waiting in Linton's truck, he saw a Camaro drive in. A Hispanic man got out of the Camaro and approached Linton's truck. After the Hispanic man walked away, Linton said, "That was Tony." "Tony" then went over and talked to defendant and Barron. Barron left with Tony in the Camaro. Linton, however, denied seeing someone named Tony that night.

Jose Pequeno's testimony was in accord with Linton's that Barron and Thomas left together in the blue Sprint.

### d. Shootings at the Spring Street House

Linton and Cyprian gave substantially similar testimony concerning the events at the Spring Street house later that night. Defendant and Linton drove to the Spring Street house in separate cars. Defendant drove his Mercedes 190, which he parked in the driveway.[5] Linton drove his Chevy Blazer, with Cyprian as his passenger, and parked in front of the house. Defendant, Linton, and Cyprian stayed in front of the house drinking beer for about an hour. They eventually made their way to the vacant upstairs apartment and continued to drink and smoke

---

[5] Both Linton and Cyprian testified that defendant drove a Mercedes 190 on the night of the murders.

marijuana. At some point, defendant received a page and made a call. Defendant told Linton that Barron wanted to come to the house to do the drug deal. In the meantime, Dino Lee had arrived and joined the others in the upstairs apartment.[6] About 10 minutes after Lee arrived, Barron and Thomas arrived in the blue Sprint. Defendant went outside to talk to them. Defendant returned and told Linton that they should go to defendant's house to get the guns and the fake cash. They left and returned while Barron and Thomas waited in their car parked outside.

Defendant, Linton, Barron, and Thomas then went to the upstairs apartment, where Cyprian and Lee were waiting. Linton entered the apartment first, and heard someone say, "Get down." Cyprian testified that defendant said, "Don't nobody move," and pulled out a .38-caliber revolver. Linton was armed with a .380-caliber weapon. Barron and Thomas lay prone on the floor. Defendant took shoestrings out of his coat pocket and instructed the others to tie the victims' hands and feet. Cyprian went through the victims' pockets and removed their wallets.

Defendant propped up Barron, who was now bound, against one of the walls, with his feet in front of him and his hands behind his back. Defendant put the .38-caliber revolver up to Barron's face and told him he wanted three kilos of cocaine. At this point, defendant told Cyprian to move the victims' car, which was parked in front of the Spring Street house, in case the victims' associates came looking for them. Cyprian left the apartment and went to re-park the victims' car around the block.

---

**6** As Lee testified in the defense case, he had not been involved with the drug deal meeting at the bar parking lot and came to the Spring Street house independently.

Defendant told Barron to talk to his associates on the phone, say that Barron had counted the money, and convince them to give defendant the cocaine. Defendant warned Barron not to speak any Spanish. Kneeling and holding his gun, defendant dialed the phone and held the receiver up to Barron's ear. Barron told him that the phone was not making a connection. Still holding his gun, defendant brought the phone down and started redialing the number. While defendant was dialing, his gun discharged and shot Barron in the chest. Defendant exclaimed, "Ah, shit, Ah, shit, man." Defendant then got up off his knees, walked over to Thomas, who was lying bound on the floor across the room, and shot him twice in the head. He then walked back over to Barron and shot him in the head once.

After the shootings, defendant, Linton, and Lee went to the backyard, and were standing around when Cyprian returned from moving the victims' car. Linton testified that defendant told Cyprian: "I had to kill a man, I had to kill him." Cyprian testified that defendant told him: "I shot 'em. It was an accident so I killed the other one because I didn't want a witness."

Defendant proposed moving the bodies. Linton moved the Blazer from the street into the garage of the Spring Street house and closed the garage doors. All four of them worked to move the dead bodies of Barron and Thomas into the back of the Blazer. Cyprian unsuccessfully attempted to clean up some of the blood on the garage floor by throwing a bucket of water on it. Defendant and the others were ready to drive off with the bodies, but Lee cried out a warning that the police were coming. About 20 to 30 minutes had elapsed between the shootings and the arrival of the police. Defendant and the three others fled, leaving the Blazer with the victims' bodies in the backseat, where police discovered them.

7

### e. Testimony of the Neighbors

#### (1) Marcella Pierre

Marcella Pierre was the mother of Dauras Cyprian (who, as described above, was one of defendant's accomplices who testified against him) and of Ernie Pierre, who lived at the house on Spring Street in which the killings occurred. Mrs. Pierre lived with Cyprian across the street. She came to know defendant, Linton, and Lee because they visited Cyprian almost daily in the five-month period before the killings.

On the evening of the killings, January 2, 1990, Mrs. Pierre testified that she had seen defendant, Linton, Lee, and Cyprian at Ernie Pierre's house. About 10:00 p.m., she was at her home across the street. She heard three or four sounds that sounded like gunshots. Approximately 10 to 15 minutes before she heard these shots, she had seen defendant, Linton, and two men she did not know standing at the gate of the house. Immediately after the shots, she looked out her window, but did not see anyone. Approximately five to 10 minutes after the shots, however, she saw defendant, Cyprian, Linton, and Lee talking loudly and arguing out on the street. She heard Cyprian ask defendant, "What did you do that for, man?" Cyprian then came across the street and filled a bucket of water from her front yard and took the bucket back toward the house. Shortly after that, the police arrived.

#### (2) Irma Sazo

Irma Sazo lived on Spring Street next door to the house where the killings occurred. Shortly after 10:00 p.m. on the night of the killings, Sazo heard three or four shots and telephoned the police. In the six months before the crime, Sazo had seen defendant visit Ernie Pierre at the house almost every day. The men would congregate in front of the house with Linton, Cyprian, and Lee. They often drank, smoked marijuana, and played loud music late into the night.

8

On the night of the killings, Sazo arrived home at 7:00 p.m. and saw what she recognized as defendant's car, a new-looking black BMW, parked next door to her house.[7] Around 10:00 p.m., she heard three or four shots coming from the house next door. Looking out her window at the street, she saw that defendant's black BMW was no longer parked there, but Linton's blue Chevrolet Blazer truck was there. She then saw four individuals in the house's front yard, whom she later identified as defendant, Linton, Cyprian, and Lee. When defendant moved closer to her house and saw her watching inside, he said, "Oh, oh, the lady is in the window." She saw Cyprian trying to open the lock on the garage door at the house where the killings occurred. Sazo also saw Cyprian go get a bucket of water from Marcella Pierre's house and bring it to the house next door.

At trial Sazo testified she saw defendant, Linton, and Lee leave the scene in Linton's Blazer.[8] However, the officer who interviewed her on the night of the killings testified that she told him she did not see those three leave the scene, but only noticed they were gone when she returned to the window after calling the police.

### f. Defendant and Cyprian Leave Los Angeles

Cyprian testified regarding his actions with defendant after the killings. Initially Cyprian fled the crime scene by foot, but defendant picked him up in a

---

**7** As described, *post* at page 16, the defense submitted evidence that defendant had owned a black BMW, but had sold it before the night of the killings. As noted *ante* at footnote 5, Linton and Cyprian testified that defendant drove a Mercedes 190 on the night of the murders.

**8** This testimony was inconsistent with the fact the Blazer containing the victims' bodies was found at the scene, and with the testimony of Linton and Cyprian.

car. They drove to defendant's house, where they removed their bloody clothing, which they placed in a bag that they gave to defendant's girlfriend (later wife) Monique Williams, who took the bag away in her car to dispose of it. Defendant and Cyprian then drove in defendant's car, the Mercedes 190, to a motel in Long Beach, where they stayed the night. The next day, defendant sold the Mercedes. Monique drove them to buy new clothing and took them to a Travelodge where defendant arranged to buy tickets for a flight to New York.[9] Monique brought suitcases and drove them to the airport, where defendant and Cyprian departed for New York. In New York, they registered at the Hotel Stanford as Michael and Mark Cole. After two or three days they moved to another hotel down the street. After another two days, they left New York. Defendant went to the airport and flew to an undisclosed destination, while Cyprian took a Greyhound bus to Las Vegas. Defendant and Cyprian eventually met in Las Vegas along with their respective girlfriends. The two couples spent two or three days together there. Cyprian returned to Los Angeles on January 14 or 15. Defendant returned to Los Angeles by January 17.

### g. *Defendant's Attempts to Fabricate an Alibi*

Raymond Valdez and his girlfriend Kathleen Matuzak testified about defendant's efforts to get them to fabricate an alibi for him for the night of the killings. In January 1990, Valdez lived with Matuzak in an apartment complex in Wilmington. By mid-January, defendant and Monique had moved into the complex, and Valdez had become acquainted with defendant; they frequently

---

**9** The prosecution introduced a registration card for this Travelodge dated January 3, 1990, and signed by defendant. A handwriting expert confirmed that it was defendant's signature.

played pool at the apartment recreational center. Valdez and Matuzak testified they initially knew defendant as "Patrick," and later as "George." Valdez bought marijuana from defendant. Defendant offered Valdez $1,500 and a substantial amount of marijuana to come to court and testify that he was with defendant on January 2, 1990 (the night of the killings). Defendant made the same offer to Matuzak and to another pair of neighbors. Valdez, however, had not even known defendant on January 2, 1990.

Valdez initially agreed because he believed defendant when he said he had been framed for the crime by a friend. After defendant was arrested, Monique Williams frequently visited Valdez and Matuzak and talked to them about getting their stories "right." Valdez also received about six telephone calls from defendant while he was in jail expressing concern that Valdez and Matuzak get their stories straight. At one point during this period, three African-American males, who Valdez thought were Rollin 60s[10] gang members, came to Valdez's apartment late at night and asked Valdez whether he was still going to testify for defendant. Defendant had told Valdez that he was a Rollin 60s gang member. The visit made Valdez fear for his and Matuzak's lives. Valdez was eventually evicted from the Wilmington apartment complex for failure to pay rent. In the week before Valdez was to testify at defendant's trial, Monique ran into Valdez in his new neighborhood and inquired whether he was still planning to testify for defendant.[11]

---

[10]     Various forms of gang names are extant, and we conform to the record throughout this opinion.

[11]     As specified later in the trial, this incident took place at a liquor store in Harbor City on the third day of defendant's trial. In her testimony for the defense, Monique denied seeing Valdez on that day.

11

### h. Testimony About the Pager Found at the Crime Scene

The prosecution contended that the pager found at the crime scene belonged to defendant. To prove this, the prosecution called Deitrich Francheska Pack, an employee of Delcomber Communications, the store that sold and provided service for the pager. Pack personally knew both defendant and defendant's girlfriend Monique Williams, with whom she had attended high school. Pack knew Linton because she had dated his cousin. Pack testified that defendant and Linton came to the Delcomber store sometime in 1989. She identified a Delcomber's contract for the purchase of a Panasonic Vanguard pager filled out by "Patrick Cole" and dated October 30, 1989. The model and serial numbers of the pager found at the crime scene matched this contract. Pack had not, however, personally sold that pager. At some point after defendant's arrest, Monique called Pack to ask her whether she could locate and destroy the Delcomber file on "Patrick Cole" in return for $100. Pack said she did not think she could do that, and had no further contact with Monique.

### i. Monique Williams's Testimony for the Prosecution

Monique Williams was defendant's girlfriend at the time of the crime and married him after his arrest. Although defendant had many tattoos on his body referring to the Rollin 60s gang, Monique testified that, since first meeting him at the end of 1988, she had never known him to be a gang member. She denied that defendant ever owned any guns, although she also stated that defendant told her he lent Linton a gun on the night of January 2, 1990 (the night of the killings). She maintained that defendant was constantly in her company from Christmas Eve 1989, through mid-January 1990 (including the time of the killings) and had never

12

left her presence longer than the time it took to get something from the store.**12** She testified that, on January 3, 1990 (the day after the killings), Cyprian came to their house and defendant asked her to drive Cyprian to the airport. Monique, defendant, and Cyprian first stopped at a hotel where Cyprian picked up a suitcase. Monique testified that she dropped Cyprian at the airport, but defendant stayed with her in Los Angeles through January 8, 1990.**13** She testified that on January 9, 1990, she and defendant travelled to Las Vegas by Greyhound bus and stayed there through January 15, 1990. While in Las Vegas, they saw Cyprian and his girlfriend. Upon returning to Los Angeles, they moved into the apartment complex in Wilmington on January 20, 1990. She admitted to speaking with Raymond Valdez and Kathleen Matuzak about testifying falsely on defendant's behalf. She denied, however, asking Deitrich Pack at Delcomber Communications to destroy the paperwork on a pager.

### j. Telephone Records

In order to further link the pager found at the crime scene with defendant, the prosecution introduced telephone records showing that numerous phone calls were placed to the pager from Monique Williams's parents' house between December 1989 and January 3, 1990. The prosecution also presented phone records to connect defendant to the victims. Records showed that, on January 2, 1990 (the day of the killings), three calls were placed from defendant's house to

---

**12**     Her testimony was thus contrary to that of several witnesses who testified that defendant was present at the Spring Street house on the night of the murders.

**13**     Her testimony was thus contrary to Cyprian's testimony that defendant checked in at a Travelodge with him and they stayed there the night before they both flew to New York. As noted above, the prosecution admitted into evidence a registration card for the Travelodge for January 3, 1990, signed by defendant.

13

A.R.A. Automotive Accessories, where the victims, Barron and Thomas, worked. Two calls were made in the morning, and one in the afternoon. Phone records also showed that, on the afternoon of the same day, one phone call was placed from A.R.A. to defendant's house.

### k. Condition of the Bodies

A medical examiner testified that Thomas died from two gunshot wounds to the upper right side of his head. The presence of soot or powder burns indicated the muzzle of the gun had been pressed against the skin when it was fired. Barron had likewise died from two contact wounds, one behind the left ear and one in the chest.

### l. Gun Evidence

Police investigators discovered two guns in the upstairs apartment where the killings occurred: a .38-caliber Smith & Wesson revolver, and a .30-caliber carbine rifle. A third gun, a .380-caliber Titan automatic pistol, was found in the garage.[14] The prosecution theory was that the .38-caliber Smith & Wesson revolver was the murder weapon.

A police investigator observed blood spatters on the .38-caliber Smith & Wesson revolver, which were evident in a photograph of the gun taken at the crime scene. These spatters were consistent with blood being blown back in the opposite direction of the trajectory of a bullet. A firearms examiner analyzed the projectiles retrieved from the bodies of both victims and determined they were

---

[14] These are the three guns that Linton testified that defendant took from his home. A fourth gun, a .30-caliber Röhm revolver, was found in Ernie Pierre's downstairs apartment.

fired from either a .38 Special or a .357 Magnum revolver.[15]  The projectiles recovered from the bodies had markings consistent with the .38-caliber Smith & Wesson revolver found at the crime scene.  The examiner, however, could not conclusively determine that it was the weapon that fired the bullets because the projectiles were damaged.

### m. Fingerprints

Defendant's fingerprint was found on the outside driver's side mirror of Linton's Blazer, which police discovered parked in the garage with the bodies of the two victims in the backseat.  Defendant's fingerprints were found on the base of a telephone in the apartment where the shootings took place.  His fingerprint was also found on a cabinet in the apartment.  Fingerprints of Linton, Cyprian, and Lee also were found at the crime scene.

### 2. Defense Case

The defense contended through various witnesses, except Lee, that the defendant was not present that night at the scene and that defendant did not commit any of the charged crimes.

### a. Dino Lee

The defense called Dino Lee, the third of defendant's accomplices.  Lee had not testified for the prosecution.  Lee's testimony, however, hurt rather than helped the defense case.  Lee testified that he saw defendant shoot Barron and

---

**15**    As the examiner testified, one cannot differentiate between these two types of guns when one has only projectiles and no cartridges for analysis.  Both guns use the same type of projectiles, although each uses a different (and incompatible) type of cartridge.

15

Thomas.**16** Lee's account of the evening was substantially similar to the testimony of the prosecution witnesses Linton and Cyprian.

### b. Detective Herrera

The defense called Detective Herrera, who investigated the crimes and who had testified for the prosecution on various details of the crime scene. Herrera testified that defendant phoned the police and voluntarily surrendered to them on February 8, 1990.

### c. Monique Williams

Monique Williams's defense testimony largely repeated her prosecution testimony, namely, that she had never seen defendant with guns and had no knowledge of his participation in any criminal activities. Additionally, she testified defendant had sold his black BMW before Christmas 1989 (that is, before the killings in January 1990). The defense introduced a Department of Motor Vehicles record that showed defendant had transferred title to the BMW on December 21, 1989. Monique testified defendant had never owned or driven a Mercedes 190. She also specifically denied that, on the third day of defendant's trial, she had approached Ray Valdez in a liquor store in Harbor City to encourage him to testify falsely at defendant's trial.

---

**16** Lee's initial version of the shooting differed slightly from Linton's. Lee testified that defendant shot Barron twice in a row — an accidental shot followed by an intentional shot — before he went over to shoot Thomas twice. But upon further questioning, Lee gave the same sequence of shots as in Linton's testimony; that is, defendant first accidentally shot Barron, then went over and shot Thomas twice, then returned to shoot Barron a second time.

### d. Ingrid Tubbs

Ingrid Tubbs was Monique Williams's aunt. Tubbs testified that, during the first week of defendant's trial, Monique was staying at the home of Monique's parents in Gardena and babysitting Tubbs's children. Tubbs's testimony was intended to support Monique's denial that she had approached Ray Valdez in Harbor City on the third day of defendant's trial.

### e. Stipulation

The parties stipulated that, before testifying at defendant's trial, Linton, Cyprian, and Lee had pleaded guilty to second degree murder on January 23, 1991, January 24, 1991, and July 9, 1990, respectively.

## B. Penalty Phase

### 1. Prosecution Case

The prosecution presented evidence of four incidents in aggravation under section 190.3, factor (b): three assaults and the possession of a firearm.

### a. Assault on Kenneth Moore

Latrece Abraham and Kermit Richmond testified that on May 28, 1983, a group of boys about 13 to 15 years old from the 59 Hoover Crips gang attacked a group of bicycle riders about the same age, including Kenneth Moore. Gang member Eddie Jackson then shot and killed Moore. Abraham testified that defendant was among the gang members who hit and kicked Moore. A police detective testifying as a gang expert stated that defendant was a member of the 59 Hoover Crips gang at the time of the assault on Moore. The prosecutor stipulated that defendant was charged with and convicted of misdemeanor assault with a deadly weapon, namely, fists and feet. He further stipulated that neither the charge nor the conviction involved possession or personal use of a firearm.

### b. *Shots Fired at Officer Sims*

Police Officer Carl Sims testified that, on December 3, 1983, shots were fired at him. He was in full uniform standing outside his squad car when the gunfire erupted from behind him. He saw an African-American male standing behind a palm tree 50 to 75 feet away facing in the direction the shots were fired. When Officer Sims aimed a shotgun at him, the suspect ran. Sims followed the suspect, who joined a group of 10 to 11 individuals dressed in gang attire who were attempting to get into a flatbed pickup truck. Sims ordered all of them to raise their hands and they were taken into custody. Sims identified defendant as the suspect behind the palm tree whom he followed to the truck. A search of the truck revealed a fully loaded .38-caliber Smith & Wesson revolver. A search of the defendant revealed that he had six rounds of live .38-caliber ammunition in his left front trouser pocket. The prosecutor stipulated that no criminal charges were ever filed against defendant in connection with this incident.

### c. *Robbery and Assault on Mona Thomas and her Father*

Mona Thomas testified that on the evening of July 7, 1985, she and her father were assaulted and robbed by a group of men when their car broke down. Around 30 men surrounded the car carrying guns. Someone threw a brick at the window. Another person demanded money. The group pulled Thomas and her father from the car. They were both beaten and bloodied.

Police Officer Michael Daly was on patrol and came across Mona Thomas and her father immediately after the assault. She told the officer that the group that had just assaulted her was standing in front of an apartment building about 100 feet away. As the officer approached the group, it began to disperse, but the officer managed to detain several individuals, including defendant, whom Officer Daly identified in court. At the scene, Mona Thomas stated that the individuals that Officer Daly had detained were the ones who had beaten and robbed her and

18

her father. Mona Thomas was unable to identify defendant in court or identify him from an arrest photograph from the incident.

### d. Possession of Concealed Weapon

Detective Michael Bowers testified that, on December 7, 1985, he conducted a traffic stop of defendant's car. He found a Smith & Wesson .38-caliber revolver containing five live rounds inside the car, between the console and the driver's seat. He arrested defendant for possession of a concealed weapon, but (as stipulated by the prosecutor) no criminal charges were ever filed.

### 2. Defense Case

The defense case in mitigation presented the testimony of defendant's mother and his two sisters.

Betty Williams Hill and Edna Williams Vickers, defendant's two sisters, testified about defendant's family background, which Betty described as "upper middle class or upper class."[17] Defendant's parents, Jessie and Charles Williams, took in defendant as a foster child when he was about one year old, and adopted him at age three or four. The Williams family later became foster parents for several mentally disabled children. Defendant was friendly with these children and would help his parents care for them. Defendant was respectful toward his parents, and helped care for his aunt when she was ill with cancer. Defendant was the father of five children, ranging in age at the time of trial from two to six years of age.[18] His sister described him as a "faithful father." Both sisters stated they were unaware of defendant's previous arrests and gang-related activities.

---

[17] Defendant's mother was a real estate broker. The house he grew up in had six bedrooms, five baths, a den, and a living room.

[18] At the time of trial, defendant was 28 years old.

19

Defendant's mother, Jessie Mae Williams, presented a profile of defendant similar to that given by his two sisters. She testified that defendant had no disciplinary problems at school, but that he dropped out of high school around the 10th or 11th grade. She stated she was unaware of defendant's previous arrests and gang activity, although she did recall a time in the early 1980s when he was incarcerated. During cross-examination, she stated she did not remember any incidents in which the police had returned defendant to her custody after he was arrested for criminal activity as a juvenile.

### 3. Rebuttal

The prosecutor entered the following stipulation: On July 2, 1980, defendant was arrested for possession of a deadly weapon. Because defendant was a juvenile, he was booked and transported home, where the arresting officer turned over custody of defendant to his mother and advised her of the nature of the arrest.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Asserted Batson/Wheeler Error

Trial counsel brought three separate motions under *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 and *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*) in connection with the prosecutor's use of peremptory challenges against five African-American women prospective jurors. The three-stage procedure of a *Batson/Wheeler* motion is now familiar. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is

20

tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

The trial court denied all three *Batson*/*Wheeler* motions at the third stage. Defendant contends the trial court erred. "Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 613.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) As long as the court "makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid*.) As explained below, we discern no error in the trial court's denial of the *Batson*/*Wheeler* motions.

### a. Background

#### (1) First Batson/Wheeler Motion

The first motion was brought after the prosecutor had exercised peremptory challenges against three African-American women prospective jurors: H. R., T. C., and P. C. The prosecutor offered to justify the excusals, and the trial court requested him to do so, remarking that "I have to say that I did have some of them marked that I expected to be exercised on." The prosecutor explained the excusals as follows: He employed a ratings system by which he rated the reluctance of a prospective juror toward answering questions he had posed about the death

21

penalty, which he considered reflective of reluctance to impose that penalty.[19] During individual questioning, he had rated all three prospective jurors as very reluctant in terms of their ability to impose the death penalty. "They would either say, well, I think I might be able to, or I could, but their reluctance to impose it was evident not only from the answers they gave [but also] from the time that it took them to respond to the question, their general demeanor in answering the questions, and my impression from each of them." The prosecutor's general impression from their answers was that "in spite of what they said, they wouldn't have the ability to impose it when it actually came down to it." Trial counsel noted that, of the 40 prospective jurors called to the box so far, only four were African-American, and the prosecutor had dismissed three of them (all of whom were women), leaving one African-American male on the jury. The trial court denied the *Batson*/*Wheeler* motion.

*(2) Second* Batson/Wheeler *Motion*

Trial counsel made a second *Batson*/*Wheeler* motion when the prosecutor exercised a peremptory challenge against Prospective Juror R. P., an African-American woman. Trial counsel noted that four out of the six African-Americans called to the box had been peremptorily challenged, and all four of them had been women. The trial court called on the prosecutor to state his reasons. The prosecutor said that, from R. P.'s initial written questionnaire, he had rated her a "two plus" on his reluctance scale, but downgraded her to a 1 after hearing her voir dire responses. The prosecutor noted that he had written next to her name on his list, "ambivalent, no opinions," which he stated was distinctive because he

---

**19**    On a scale of 1 to 5 (with 1 showing the most reluctance) he rated H. R. a one, T. C. a 3 minus, and P. C. a 2 minus.

usually did not write anything next to the names. He read to the court three of R. P.'s voir dire responses that had given him the impression that she would be hesitant to impose the death penalty.[20]

In response, trial counsel argued that R. P.'s answers to other questions indicated she was willing to impose the death penalty. The prosecutor replied that his impression "had a lot more to do with not what she said but how I read what she was saying from being present in court with her and observing her demeanor and the way she answered questions. It clearly isn't from the words that are written down. It was my general impression from the way she answered the questions, not what she said."

The trial court denied the motion. It stated that, though it had taken notes relating to the demeanor and manner of responding of some of the prospective jurors, it did not have any notes on R. P., but would accept the prosecutor's explanation.

### (3) Third Batson/Wheeler Motion

Trial counsel made a third *Batson*/*Wheeler* motion when the prosecutor peremptorily challenged Prospective Juror R. J., an African-American woman. Trial counsel observed that five out of six African-American prospective jurors had thus far been challenged and noted that R. J. was on the panel at a time when the prosecutor had accepted it. The prosecutor replied that he had accepted this prospective juror because "the [jury] composition was somewhat satisfactory to me," but that he reviewed his notes, and had seen that he had rated her as very reluctant to impose the death penalty. The prosecutor's impression, which he

---

[20] These voir dire responses are quoted in the part concerning R. P., *post*, at pages 30-33.

23

stated was formed not only from her answers to the questions but from her demeanor and the fashion in which she answered them, was that she would not be able to impose the death penalty in any case.

The trial court denied the *Batson/Wheeler* motion. It did not recall R. J.'s responses and, as observed earlier, had stopped taking notes by the time she was questioned. The trial court stated that it could only go by what the prosecutor was saying, and it accepted the prosecutor's explanation.

Defense counsel then asked the trial court "to respond to the numbers," arguing that they "speak for themselves." The trial court replied, "I have to say in my other death penalty cases I have found that the black women are very reluctant to impose the death penalty; they find it very difficult no matter what it is." The trial court then made clear, however, that it was not making its ruling based on that observation.

The final composition of the jury, which the prosecutor put on the record, was seven Caucasians and five African-Americans, of whom four were men and one was a woman.

### b. Analysis

#### (1) Asserted Bias of Trial Court

Defendant acknowledges the "great deference" an appellate court gives to the trial court's ability to distinguish bona fide reasons from "sham excuses." (*People v. Burgener*, *supra*, 29 Cal.4th at p. 864.) Defendant argues, however, that no deference should be given here to the trial court's evaluation of the prosecutor's professed race-neutral reasons because, he asserts, the trial court itself was biased against African-American women, as indicated by its comment quoted directly above.

24

The trial court's observation came in specific response to trial counsel's question about the numbers of such peremptories at that point in voir dire. The court clarified that its general observation did not influence its ruling. The trial court quickly made clear that its observation played no role in its ruling on the *Batson*/*Wheeler* motion: "I am just making a little point. I just wanted to tell you my observation that I have seen this before and I can understand why. That's why. But I am not making my ruling based on that." Further, it was an isolated comment, and the record as a whole does not support defendant's contention that the trial court was biased against African-American women. We have no reason to doubt that the trial court made its rulings on the *Batson*/*Wheeler* motions based on the evidence before it. On this record, we perceive no bias on the trial court's part, and we therefore grant its rulings their usual deference.

### *(2) Adequacy of the Trial Court's Review of the Prosecutor's Race-neutral Reasons*

Defendant contends the trial court failed to adequately clarify or probe the prosecutor's explanations about the demeanor of the prospective jurors. In particular, he points to the two jurors challenged in the second and third *Batson*/*Wheeler* motions, R. P. and R. J., as to whom the trial court indicated it had not taken notes and had no independent recollection at the time of those *Batson*/*Wheeler* motions.

"Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." (*People v. Silva* (2001) 25 Cal.4th 345, 385-386.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record,

25

inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Id*. at p. 386.) However, we also have stated that a trial court is not required "to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 929.) With these principles in mind, we will review the record below of the five challenged prospective jurors.[21]

The prosecutor's stated race-neutral reason for striking the challenged prospective jurors — reluctance to impose the death penalty — was not "inherently implausible." As we have stated, "[a] prospective juror's views about the death penalty are a permissible race- and group-neutral basis for exercising a peremptory challenge in a capital case." (*People v. McDermott* (2002) 28 Cal.4th 946, 970-971.) We therefore examine the record to see whether it supports the prosecutor's stated race-neutral reason that these prospective jurors appeared reluctant to impose the death penalty. The prosecutor's stated reason has both a semantic aspect and a demeanor aspect, that is, a prospective juror's hesitancy to impose the death penalty can be reflected in both what the prospective juror said and how he or she said it. At certain points during his explanation the prosecutor emphasized the demeanor aspect over the semantic aspect. As we discuss below, the trial court stated that it did not recollect the demeanor of two of the challenged prospective jurors, R. P. and R. J. However, as we further discuss below, the prosecutor based his explanation on both words and demeanor. In reviewing the

---

[21]     Justice Liu's dissent acknowledges that the approach the majority opinion follows is based on our precedents as expressed in *People v. Silva*, *supra*, 25 Cal.4th at pages 385-386, and *People v. Reynoso*, *supra*, 31 Cal.4th at page 929. (Dis. opn. of Liu, J., *post,* at pp. 21-22.) Those decisions guide us until the United States Supreme Court articulates a contrary rule.

correctness of a trial court's ruling on a *Batson/Wheeler* motion, we consider "all the circumstances of the case." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 908, citing *Wheeler*, *supra*, 22 Cal.3d at p. 280.) The circumstances of the case include what the jurors said and wrote in connection with voir dire and the reasonable inferences that can be drawn from those statements. We conclude that the record supports the prosecutor's stated reasons for exercising the peremptory challenges.

### (i) Prospective Juror H. R.

In her jury questionnaire, in response to a question about her general feelings concerning the death penalty, Prospective Juror H. R. wrote: "I feel the death penalty should only be enforced only under certain hardcore murders." As to whether the death penalty is used too often, she wrote: "I really don't know of a case in which it was used." As to whether California should have the death penalty today, she marked "yes," and as to why, she wrote: "Under certain circumstances." As to what she saw as the purpose of the death penalty, she wrote: "No comment." As to her attitude toward the proposition that all intentional unlawful and non-self-defense killings should receive the death penalty, she circled "disagree somewhat," and wrote: "Not everyone, but hardcore murders." As to whether she believed that life in prison without the possibility of parole was a more severe punishment than the death penalty, she circled "Don't Know."

When questioned during voir dire what she meant by "hardcore murders," she replied: "You know, like cruel murders, where they [mutilate] bodies and . . . burn people up for no reason." Asked by the prosecutor whether these were the only types of murders as to which she personally would be able to impose the death penalty, she answered that she was not sure, but they were the first ones that came to mind when she thought of the death penalty. When asked further about

27

what she meant by the term "hardcore murders," she answered: "I mean burning of bodies and mutilating body parts, I would probably think of that, but *besides that I really can't say what other reasons I would consider the death penalty.*" (Italics added.)

The record supports the prosecutor's stated race-neutral reason for excusing H. R. (*People v. Silva*, *supra*, 25 Cal.4th at p. 386.) Even on a cold record, H. R.'s comments suggest some degree of ambivalence toward the imposition of the death penalty, especially her comments about what kind of "hardcore murders" came to mind as appropriate for the death penalty.

*(ii) Prospective Juror T. C.*

T. C.'s responses on the written questionnaire generally indicated willingness to impose the death penalty. However, she answered "yes" to the question whether she would, at the penalty phase, vote for life in prison without the possibility of parole regardless of the evidence. During voir dire, she said she had misunderstood this question, and that she would answer no. She answered "yes" to the question whether she believed that life in prison without the possibility of parole was a more severe penalty than the death penalty. During voir dire she also clarified that she actually believed the death penalty was more severe than life in prison without the possibility of parole.

T. C.'s voir dire answers reflect equivocation and hesitancy. Defense counsel asked her: "Some people may say the death penalty is a good thing but wouldn't want to be a juror in that situation where they actually vote for it. Are you in that particular situation?" T. C. answered: "No, I wouldn't want to vote for it — I mean, I would vote for it, but if, like I was on the jury, I wouldn't want to put myself in that predicament to vote for a death penalty if I were a juror." This lead to the following exchange:

28

"Defense counsel:  If you are on this jury you're in that predicament.  Could you impose the death penalty.

"T. C.:  I could but I wouldn't.

"Defense counsel:  You wouldn't under any circumstances.

"T. C.:  No.

"Defense counsel:  So if you are a juror in this case you wouldn't impose the death penalty under any circumstances?

"T. C.:  Well, like I said, like I told her in certain situations but I can't say I would just vote for the death penalty.  But in certain situations."

The prosecutor asked T. C. whether she thought she was the type of juror who could actually impose the death penalty if it was justified by everything she had heard.  Her answer again reflects equivocation and hesitancy:  "If I heard everything in the evidence and if I feel that I opposed it and then I changed my mind on it, I would overrule it, you know.  Like say if I heard more evidence and I say I was wrong in thinking this and I heard a little more and I decide that the death penalty shouldn't be then I would overrule it."

The record supports the prosecutor's stated race-neutral reason for excusing T. C.  (*People v. Silva*, *supra*, 25 Cal.4th at p. 386.)

### (iii) Prospective Juror P. C.

In her jury questionnaire, in response to a question about her general feelings about the death penalty, P. C. wrote:  "It's fair in some cases."  As to whether California should have a death penalty, she wrote:  "Have not decided as of yet."  As to whether every intentional unlawful and non-self-defense killing should receive the death penalty, she circled "agree somewhat," and wrote as an explanation:  "Every case has different circumstances."

29

In voir dire, when the prosecutor asked about her response that she had not decided as yet regarding the death penalty, she answered: "I haven't decided. I really don't know." Asked how she would vote on a ballot initiative determining whether California should have the death penalty, she answered: "I don't know if I would." Asked whether she would include the death penalty if she were the hypothetical ruler of an island who determined the laws, she answered: "I think I would, yeah." Asked whether, if the circumstances warranted it and after hearing all the evidence, she could see herself imposing the death penalty on another person, she answered: "I think I could."

The record supports the prosecutor's stated race-neutral reason for excusing P. C. (*People v. Silva*, *supra*, 25 Cal.4th at p. 386.) Even on a cold record, P. C.'s comments suggest some ambivalence and equivocation toward imposing the death penalty, such as her indecision about whether California should have a death penalty, and the qualification of her answers with the phrase "I think."

### (iv) Prospective Juror R. P.

R. P.'s written questionnaire generally indicated a willingness to impose the death penalty. As to her general feelings regarding the death penalty, she wrote: "It is sometimes necessary." Some of her voir dire answers, however, suggest the equivocation and hesitancy described by the prosecutor in justifying the use of a peremptory challenge against her. The following exchange, which the prosecutor quoted in substantial part during the discussion of the second *Batson*/*Wheeler* motion, reflects this:

"Prosecutor: Do you think the death penalty serves a deterrent value in our society?

"R. P.: It's possible that it might. As I said it would depend on the case. It's not something that I could say yes or no on without — just a broad statement.

30

"Prosecutor: I just want your feelings. Do you think the death penalty serves a deterrent value to yourself? Do you think it does?

"R. P.: *I hadn't really pinned it down.*

"Prosecutor: You don't have feelings one way or the other as to whether it serves a deterrent value or not?

"R. P.: *Sometimes it would and sometimes it would not.* With some people it would and with some people it would not.

"Prosecutor: In terms of your own feelings on the death penalty, you can't give me any more guidance on how you feel about it other than you haven't really thought about it?

"R. P.: *No, I really haven't. It is just not something that I would — could say yes, it would, or no, it wouldn't, because I hadn't thought of it in that terms seriously.*" (Italics added.)

Based on R. P.'s statements, we conclude the record supports the prosecutor's stated race-neutral reason for excusing R. P. (*People v. Silva*, *supra*, 25 Cal.4th at p. 386.)

Defendant contends, however, that, even though the prosecutor referred in detail to the voir dire responses quoted above, the prosecutor focused on R. P.'s demeanor, rather than the statements themselves. Indeed at one point, the prosecutor stated: "It clearly isn't from the words that are written down. It was my general impression from the way she answered the questions, not what she said." Defendant contends therefore that the prosecutor's stated reason stands or falls on R. P.'s demeanor alone. Defendant acknowledges that an appellate court normally grants great deference to a trial court's evaluations of demeanor. Defendant notes, however, that the trial court stated it had stopped taking notes on the prospective jurors after a certain point and had no notes on R. P. Consequently, defendant contends we can grant no deference to the trial court's

31

ruling because it was based entirely on the demeanor of a prospective juror that it admitted it could not recall.

We reject both premises of defendant's argument here. First, we reject the contention that the prosecutor's stated reason of R. P.'s hesitancy to impose the death penalty stands or falls on her demeanor alone. As noted above, the prosecutor quoted and referred to R. P.'s voir dire answers. In the course of a series of back- and forth exchanges with defense counsel, the prosecutor emphasized the demeanor aspect and stated that it had more weight than R. P.'s words alone. But such remarks did not represent that he was withdrawing any reference to the words and was depending on demeanor alone. We are not therefore precluded from considering R. P.'s words and the reasonable inferences that can be drawn from them.

Second, the trial court's apparent lack of personal recollection of R. P.'s demeanor does not remove any and all basis for deference to the trial court's ruling on the *Batson*/*Wheeler* motion. (*Thaler v. Haynes* (2010) 559 U.S. 43, __ [130 S.Ct. 1171, 1175].) Although the United States Supreme Court has stressed the importance of a trial court's firsthand observation of the prospective juror's demeanor (*Snyder v. Louisiana* (2008) 552 U.S. 472, 477), the high court has, however, also stated that "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor." (*Thaler v. Haynes*, *supra*, 559 U.S. at p. __ [130 S.Ct. at p. 1175].) Similarly, this court has listed contemporaneous observations of voir dire as one among several important factors by which the trial court can assess the credibility of the prosecutor's explanations: " 'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Miller-El* [*v. Cockrell* (2003) 537 U.S. 322,] 339.) In assessing credibility, the court draws upon its

32

contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*People v. Lenix, supra,* 44 Cal.4th at p. 613, fn. omitted.)  Even though we find the prosecutor's stated race-neutral reason adequately supported by R. P.'s statements alone, we do not discount the trial court's ability to assess the credibility of the prosecutor, even absent the trial court's personal recollection of R. P.'s demeanor.

### *(v) Prospective Juror R. J.*

The ruling on the *Batson*/*Wheeler* motion as to R. J. raises issues similar to those of R. P., just discussed.  The prosecutor explained that his peremptory as to R. J. was based on his impression that she would be unable to impose the death penalty because of her answers and the demeanor and fashion in which she answered his questions.  The trial court stated that it did not recall the responses of this prospective juror.  We therefore review R. J.'s voir dire statements to ascertain whether they support the prosecutor's stated reason and conclude that they do.

R. J.'s written questionnaire generally expressed support for the death penalty, but contained qualifying language that can reasonably be interpreted as showing equivocation or hesitation.  As to her general feelings regarding the death penalty, R. J. wrote:  "Capital punishment has never been a deterrent to crime but it is necessary in our society *because so many people think it is*."  (Italics added.)  She marked "yes" as to whether she felt that California should have the death penalty today, and wrote as an explanation:  "Even though it would take a long time between sentencing and actual execution, the penalty would be *somewhat* of a solace to the friends, family of the victim."  (Italics added.)  During voir dire, she clarified that she did not think that capital punishment was a deterrent to crime

because "there are so many people in jail for capital crimes." As to whether every intentional unlawful and non-self-defense killing should receive the death penalty, she circled "agree somewhat," and wrote as an explanation: "*I just don't strongly agree or disagree* so [']somewhat['] comes closest to any answer I could give at this point." (Italics added.) She marked "don't know" in response to the question whether she believed that life in prison without the possibility of parole was a more severe punishment than the death penalty.

Finally, we note the fact that the prosecutor had previously accepted three panels with R. J. on each of them, a fact that was raised during the discussion of the *Batson/Wheeler* motion. Although this is not a conclusive factor, we have stated that "the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Snow* (1987) 44 Cal.3d 216, 225.)

### (vi) Prospective Juror D. J.

As just discussed, we conclude that the record supports the prosecutor's stated race-neutral reason for peremptorily challenging R. J. The record, however, also presents the possibility that the prosecutor mistook R. J. for another prospective juror, D. J., also an African-American woman, who happened to have the same last name. Based on our review of the entire record, we conclude that this act of mistaken identity is the most probable explanation of the events disclosed in the record and that there was no violation of *Batson/Wheeler*.

### (a) Background

As discussed, *post*, in part D., following defendant's conviction and sentence of death, defense counsel brought a motion for new trial, the central claim of which was ineffective assistance of counsel, but which also included a claim of

34

*Batson*/*Wheeler* error.  In the hearing on the *Batson*/*Wheeler* portion of the new trial motion, the trial court stated that it had not made a very good record on this topic and asked the prosecutor to put on the record the notes he had taken during juror voir dire, which had been alluded to during the sidebar discussions of the *Batson*/*Wheeler* motions.  The prosecutor stated he wished to incorporate all the statements he made during the colloquy on the *Batson*/*Wheeler* motions as to why he excused the jurors in the first place and he then went on to provide a chronological narrative of the 16 peremptory challenges he had used, providing the name and a description of each of the prospective jurors he had excused. Relevant here is his description of the 14th challenge as being to D. J., "a married 39-year-old black female."  No mention is made of R .J., who, according to her jury questionnaire, was "remarried" and 65 years old.  D. J.'s juror questionnaire indeed indicates that she was "married" and 39 years old.  The prosecutor then discussed the five prospective jurors who were the subjects of the *Batson*/*Wheeler* motions.  For the fifth African-American woman excused, he erroneously named D. J., not R. J., and stated the following reasons:  "I've got her responses 95 through 107, and 103 and I have a note to myself, 'plus look at her responses to my voir dire at the *Hovey*,' and I had made a challenge for cause so apparently I felt that she shouldn't have been around even by the time we got to general voir dire."

At the new trial motion hearing, the apparent discrepancy between the prosecutor's discussion of D. J. as the fifth African-American woman juror excused rather than R. J., as listed in the reporter's transcript, was not raised by defense counsel or commented on by the trial court.[22]

---

[22]    As discussed in part D., *post*, defense counsel for the new trial motion was an attorney named Douglas Otto, who had been appointed because the motion

*(footnote continued on next page)*

35

The record supports the prosecutor's representations regarding D. J.  Her responses in her written questionnaire about the death penalty (responses 95 through 107 as noted by the prosecutor) reflect opposition to the death penalty. When asked about her general views regarding the death penalty, she wrote:  "I'm not for the death penalty.  Life in prison is what I'm for.  I don't think know [*sic*] one has right to take someone [*sic*] life.  I feel if the person is guilty, they should do there [*sic*] time."  She answered that her views were based on religious conviction, and in response to the question whether California should have the death penalty, she wrote:  "I believe that there [*sic*] time spent in prison . . . [is] all the punishment we should be able to give.  Death to me should be when God call [*sic*] them home."  For question 103, (highlighted by the prosecutor in his notes), which asked whether she would automatically, in every case, regardless of the evidence, vote for the death penalty, she circled "don't know," and wrote in the margin:  "I'm against the death penalty."

In her individual voir dire, the prosecutor asked D. J. about her "death to me should be when God calls them home" comment.  After a series of questions in which she appeared to indicate that she would always vote for life in prison without the possibility of parole in spite of the evidence, the prosecutor made a

*(footnote continued from previous page)*

asserted that trial counsel, Ronald J. LeMieux, had rendered ineffective assistance. Otto had not been present during any of defendant's trial.  LeMieux had also filed a new trial motion based on *Batson*/*Wheeler* error and identified R. J. as the fifth excused African-American woman based on the transcript.  But LeMieux himself had not been present during jury selection either.  An associate attorney, Douglas E. McCann, conducted jury selection.  An additional factor that may have led to the confusion of identities was that R. J. did not write her name in the space provided on the first page of her juror questionnaire; she only signed the questionnaire at the end.

36

challenge for cause. In a sidebar discussion, defense counsel argued that D. J.'s religious views were not necessarily incompatible with the death penalty. The court then allowed defense counsel to engage in a series of questions to rehabilitate D. J. The trial court asked her a final question to which D. J. stated that she felt she could impose the death penalty if it was appropriate. The trial court then asked her to return for general jury selection, impliedly denying the prosecutor's excusal for cause.

### (b) Analysis

In *People v. Williams* (1997) 16 Cal.4th 153, 188, a *Batson*/*Wheeler* motion challenged the excusal of a juror whom the prosecutor stated he had excused "in error." We found no violation of *Batson*/*Wheeler*, holding that "a genuine 'mistake' is a race-neutral reason." (*Id*. at p. 189.) In another case, the prosecutor gave a reason for excusing a juror, which, the prosecutor later discovered and informed the court, was mistakenly based on information in the questionnaire of another juror with the same last name. (*People v. Phillips* (2007) 147 Cal.App.4th 810, 814.) Citing our holding in *Williams*, the Court of Appeal found no violation of *Batson*/*Wheeler*. (*Phillips,* at p. 819.)

Here, unlike *Williams* and *Phillips*, the court and the parties were never made aware of the prosecutor's possible error in excusing the prospective juror. This difference, however, does not in itself affect the determination whether the prosecutor's excusal was based on a race-neutral reason. The information disclosed at the new trial motion hearing strongly supports the race-neutral reason the prosecutor gave at the time of the motion — hesitancy to impose the death penalty. Therefore, assuming that the prosecutor mistakenly excused R. J. because he thought she was D. J., there was no violation of *Batson*/*Wheeler*.

*(3) Comparative Juror Analysis*

Defendant argues that the excluded jurors addressed in the *Batson*/*Wheeler* motions gave answers that were no more equivocal than the jurors who were ultimately seated. Defendant contends that if the prosecutor were indeed as concerned about equivocal answers and reluctance to impose the death penalty as he professed to be, he would have struck some of the jurors he left on the jury, because he had three peremptory challenges left when he accepted the jury.

As we have stated, comparative juror analysis must be considered for the first time on appeal while reviewing third stage *Batson*/*Wheeler* claims when a defendant relies on such evidence and the record is adequate to permit the comparisons. (*People v. Lenix, supra,* 44 Cal.4th at p. 607.) But we have warned of the inherent limitations of such evidence. "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact." (*Id*. at p. 622.) "A transcript will show that the panelists gave similar answers: it cannot convey the different ways in which those answers were given. Yet those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror." (*Id*. at p. 623.)

Defendant contends the seated jurors expressed as much or greater "reluctance" to impose the death penalty compared with the African-American women the prosecutor struck. Defendant reviews the comments of five of the seated jurors and focuses on any statement that could possibly be interpreted as showing some reservation or equivocation in imposing the death penalty.[23] The

---

[23]     Defendant points to the following:

*(footnote continued on next page)*

(1) When asked if she thought she could impose the death penalty against defendant if the prosecutor asked her to, Seated Juror L. B. replied: "Well, if he's going to do it that doesn't mean I have to vote for death." When asked if she had the ability to impose the death penalty, L. B. stated: "Yes, I think so."

(2) The following voir dire interchange between the prosecutor and Seated Juror D. H.:

"Prosecutor: What do you think about being asked to sit on a jury where ultimately if we get to the end I'm going to stand up and look at you as a juror and ask you to put this man here to death; what do you think about that?
"D. H.: Well, it's a big decision to make, but if the evidence is there and it's true, if that's the decision that has to be made I think I can make it.
"Prosecutor: Okay, it would be a tough decision?
"D. H.: It would be. It's something you don't like to do.
"Prosecutor: Of course not. Do you think the death penalty serves a deterrent value?
"D. H.: I think, I think so far as I am concerned, and that is about all I can answer, I think so."

(3) Seated Juror W. J. gave the opinion that life in prison without the possibility of parole was a more severe sentence than death because "it would be with them all the time, instead of giving them death and it would just be over with. When asked about his feelings toward the death penalty, W. J. stated he thought it would apply to really horrible crimes such as murder with no remorse. When asked whether if he came to the conclusion that the death penalty was the appropriate verdict, he would be able to impose it, he answered: "Yes, I think so."

(4) Seated Juror L. S. did not think the death penalty should be imposed for crimes of passion.

(5) Seated Juror B. H. told the court that he would prefer not to be a juror because it caused him some discomfort. When asked his views on the death penalty, he stated that be believed some people could be rehabilitated and others could not but he would need to decide on a case by case basis. When asked whether he would have the ability to impose the death penalty, he answered: "Never having done it before, I believe I could. Without having that experience, you know, it's kind of a hard thing to say, 'yeah, I definitely will,' but I believe that I could do that if that's what I felt was necessary."

39

People, in turn, point to statements by the same seated jurors indicating their willingness to impose the death penalty.**24** We are not persuaded by defendant's argument. We see no instances in the cold record reflecting that the seated jurors expressed as much or greater a reluctance to impose the death penalty as the excluded prospective jurors.

### (4) Prosecutor's Comments on Exercising Challenges Against Caucasian Prospective Jurors

Defendant points to comments the prosecutor made about challenging Caucasian jurors as evidence that the prosecutor challenged the five African-American women prospective jurors for race-based reasons. The prosecutor made the following comments during the course of stating for the record the final racial composition of the jury: "First of all, I would like to indicate the last number of challenges I exercised were against White jurors, to be replaced by Black jurors. The reason they were exercised was, first of all, I wanted a greater mix of racial diversification on this jury. [¶] Second, they just happened to be a couple of Black jurors I rated very high because of their answers where they indicated they had an ability to impose the death penalty in a particular case." Defendant did not raise below, nor does he now raise, a *Batson*/*Wheeler* claim based on peremptory

---

**24** (1) L. B. said that she could impose the death penalty, that she strongly supported the death penalty, and that she had voted for the death penalty in a recent election.

(2) D. H. indicted she was willing to impose the death penalty.

(3) W. J. stated he could impose the death penalty if it was "the appropriate thing." When the prosecutor directly asked if Jackson could impose the death penalty, Jackson responded, "Yes."

(4) L. S. indicated she was willing to impose the death penalty.

(5) B. H. said he could impose the death penalty in "certain kinds of situations." He later added that he believed that he could impose the death penalty "if that's what I felt was necessary."

challenges to Caucasian jurors.  Defendant raises the prosecutor's comments only to the extent they cast the prosecutor as someone liable to discriminate on the basis of race.  On this record, however, the prosecutor's comments about seeking a greater mix of racial diversification do not appear to us to show that he discriminated against African-American women jurors.  Finally, as noted, the ultimate composition of the jury was seven Caucasians and five African-Americans (four men, one woman).  Although " 'the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 938, fn. 7.)

### 2. *Asserted* Witt *Error*

Defendant contends the trial court erred in granting the prosecutor's for-cause challenge to two prospective jurors, and in denying defense counsel's for-cause challenge to a juror who eventually sat.  As we explain, the trial court did not err in these rulings.

The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment focuses on " '[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7, quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Applying *Witt*, we have stated:  " ' " '[a] prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.]  In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to

41

the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Blair* (2005) 36 Cal.4th 686, 743 (*Blair*), quoting *People v. Jenkins* (2000) 22 Cal.4th, 900, 987.) "The same analysis applies to claims involving erroneous juror exclusion or inclusion." (*People v. Hoyos* (2007) 41 Cal.4th 872, 905.)

### a. Granting of Prosecution's For-cause Challenges

#### (1) Prospective Juror G. R.

Prospective Juror G. R.'s written questionnaire expressed strong opinions against the death penalty. As to his general feelings regarding the death penalty, G. R. wrote: "I do not believe the death penalty is morally just." Regarding whether he felt the death penalty was used too often, he circled "yes" and wrote: "Once is too much." He marked "no" to the question whether California should have a death penalty. Concerning whether every intentional unlawful and non-self-defense killing should receive the death penalty, he circled "strongly disagree" and explained: "Don't believe in the death penalty."

Defense counsel sought to rehabilitate G. R. during a lengthy voir dire. G. R. stated that he could "see himself voting for the death penalty if that's what the law had dictated." Defense counsel informed him that "the law never dictates that you must vote for the death penalty" and "always gives you that option to do what you feel is appropriate under the circumstances." G. R. stated, "If it were completely my option, I would not vote for the death penalty." Defense counsel stated that the law "doesn't say it's completely your decision. It says that you're supposed to impose the appropriate sentence. Appropriate will go towards the evidence that you see." G. R. stated: "I believe I could go with the appropriate sentence."

The prosecutor also engaged in extensive questioning. G. R. stated that "on a personal level" he did not think the death penalty was an appropriate punishment

but stated that in the judgment process his prejudices would not be strong enough to sway his decision. The prosecutor asked G. R. whether he could think of any circumstance that would cause him to believe that the appropriate sentence for anyone would be the death penalty. G. R. said he could think of none that would cause him to "personally believe" that the death penalty was appropriate.

After the prosecutor moved to excuse G. R. for cause, the court asked G. R. further questions and held two sidebar conferences, in which the prosecutor and defense counsel elaborated their positions. Defense counsel summed up the seeming contradiction presented by G. R.'s answers at voir dire as follows: G. R. was personally opposed to the death penalty, could not imagine a situation in which he personally felt it should be imposed, but also maintained he could follow the law, do what was appropriate, and be fair and impartial.

At the second sidebar conference, the prosecutor contended that no matter what questions he asked, G. R. would not acknowledge that the death penalty could, under any circumstances, be the appropriate sentence. The trial court agreed that G. R.'s views regarding the death penalty substantially impaired his ability to serve as a juror: "He would like to think he was not, and he was trying to get us to believe that he can be very objective and forget his own feelings, but his answer keeps coming back to his own convictions. Personally, he cannot do it." Defense counsel responded that G. R. had never indicated on the record that he could not personally impose the death penalty as a juror. The prosecutor agreed, but added: "[O]n a personal level he can never accept any situation as calling for [the death penalty] being an appropriate penalty, which precluded him from ever being faced with that issue, and that's why he doesn't have to say that." The trial court agreed. Over defense counsel's objection, the trial court found G. R.'s ability to serve as a juror to be substantially impaired and excused him for cause.

43

Defendant contends the trial court erred. We disagree. Based on our review of the record, we uphold the ruling as fairly supported, and we accept the trial court's determination as to G. R.'s state of mind given his conflicting or ambiguous statements.[25] (*Blair*, *supra*, 36 Cal.4th at p. 743.)

### *(2) Prospective Juror E. C.*

In her written questionnaire, Prospective Juror E. C. wrote that she had mixed feelings regarding the death penalty, and circled "no" to the question whether she felt California should have a death penalty. During voir dire questioning, she stated she had "very mixed feelings" about the death penalty, would prefer to live in a state that did not have the death penalty, and, if it were to come up on the ballot, she would not vote for it. She acknowledged that, although it would be difficult to impose the death penalty, "if it came right down to it," she "*probably could.*" (Italics added.) After the prosecutor pressed her on this point, however, she equivocated in the other direction, stating she probably could not vote for a verdict of death. When asked by the court what she meant by "probably," she responded: "There is still a part of me that thinks that I could but I'm just not

---

[25] Defendant asks us to reconsider our long-standing formulation that, if fairly supported by the record, we will accept as binding the trial court's determination as to a prospective juror's state of mind when the prospective juror has made statements that are conflicting or ambiguous. (*Blair*, *supra*, 36 Cal.4th at p. 743.) Defendant contends our formulation reverses the state's burden, citing *Wainwright v. Witt, supra,* 469 U.S. at page 423, which states: "it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." But we see no conflict with *Witt*, which "does not require that a juror's bias be proved with 'unmistakable clarity.' " (*Id*. at p. 424.) Despite a "lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . This is why deference must be paid to the trial judge who sees and hears the juror." (*Id*. at pp. 425-426.)

certain.  I'm really not."  When the trial court asked whether she would prefer not to sit on a case in which she had to make a death determination, she answered, "I probably shouldn't," and began to cry.

The prosecutor challenged E. C. for cause based on her answers and emotional reaction to the questions.  Defense counsel objected, but the trial court made a finding that her views and reactions would substantially impair the performance of her duties as a juror.  Based on our review of the record, we uphold the ruling as fairly supported, and we accept the trial court's determination as to E. C.'s state of mind.  (*Blair*, *supra*, 36 Cal.4th at p. 743.)

### b.  Denial of Defense For-cause Challenge:  Juror R. C.

Defense counsel unsuccessfully challenged for cause R. C., who eventually sat as a juror at defendant's trial.  Defendant contends the trial court erred in denying the challenge.  Preliminarily, the People contend defendant has forfeited this claim.  "[A] defendant challenging on appeal the denial of a challenge for cause must fulfill a trio of procedural requirements:  (1) the defense must exercise a peremptory challenge to remove the juror in question; (2) the defense must exhaust all available peremptory challenges; and (3) the defense must express dissatisfaction with the jury as finally constituted."  (*People v. Weaver* (2001) 26 Cal.4th 876, 910-911.)  As the People observe, and defendant does not contest, although defendant had peremptory challenges available to him when R. C. was seated on the jury, he did not use them to dismiss R. C.[26]  Defendant also failed to

---

**26**     After R. C. was placed in the jury box, defense counsel exercised 13 peremptory challenges before accepting the jury.  He then exercised four more peremptory challenges before again accepting the jury.  He exercised his final two peremptory challenges before the jury was finally selected with R. C. as one of the jurors.

communicate his dissatisfaction regarding the jury to the trial court. Defendant has therefore forfeited this claim. (*Ibid*.)

Even were we to reach the merits of this claim, we would find no error. The trial court and the parties engaged R. C. in an extended voir dire on the issue of whether he would automatically vote for the death penalty regardless of the mitigating evidence at the penalty phase. In the initial rounds of questioning, R. C.'s answers appeared conflicting. Although he initially stated he would automatically impose the death penalty if the aggravating circumstances outweighed the mitigating circumstances, he later said he could impose life in prison without the possibility of parole if he believed that sentence was appropriate, even if the aggravating circumstances outweighed the mitigating circumstances. When defense counsel noted that R. C. had previously stated he would automatically vote for death if the aggravating circumstances outweighed the mitigating circumstances, R. C. said he now wanted to retract that statement because the prosecutor's explanations had made him better understand the penalty phase process. In denying the defense motion, the trial court observed the final round of questioning had clarified R. C.'s position. The record supports the trial court's conclusion that R. C. did not hold views that would prevent or substantially impair the performance of his duties as a juror. (*Blair*, *supra*, 36 Cal.4th at p. 743.) To the extent R. C.'s statements were conflicting or ambiguous, we accept the trial court's determination as binding. (*Ibid*.)

### B. Guilt Phase Issues

#### 1. Failure to Give a Limiting Instruction Regarding Guilty Pleas of Defendant's Accomplices

Defendant's accomplices Linton, Cyprian, and Lee were charged with noncapital first degree murder, eventually pleaded guilty to second degree murder, and subsequently testified at defendant's trial. Defendant contends his United

46

States Constitution Sixth Amendment confrontation clause rights were violated because the trial court failed to instruct the jury that it could not infer defendant's guilt from the accomplices' guilty pleas. Defendant's claim fails because Linton, Cyprian, and Lee testified in person and were subjected to defense cross-examination. *Bruton v. United States* (1968) 391 U.S. 123, and its progeny, on which defendant relies, are inapplicable, because these cases involve the use of out-of-court statements by un-cross-examined codefendants to incriminate a defendant at a joint trial. (See *Nelson v. O'Neil* (1971) 402 U.S. 622, 629-630 [codefendant's extrajudicial statement implicating the defendant need not be excluded when the codefendant testifies and is available for cross-examination].)

Defendant's reliance on a Ninth Circuit case, *United States v. Halbert* (9th Cir. 1981) 640 F.2d 1000 is also unpersuasive. Preliminarily, decisions by the federal courts of appeal are not binding on us. (*People v. Seaton* (2001) 26 Cal.4th 598, 653.) Second, the premises underlying the ruling in *Halbert* do not apply here. In *Halbert*, codefendants testified against the defendant and were asked by the prosecutor during direct examination about their guilty pleas to conspiracy to commit mail fraud. (*Halbert*, *supra*, at p. 1004.) Over defense objection, both of the codefendants were allowed to tell the jury they pleaded guilty to the conspiracy for which the defendant was on trial. (*Ibid.*) The Ninth Circuit reversed, holding that, "[w]ithout instruction, it is possible the jury could use the pleas as evidence of [Halbert's] guilt," and that the trial court erred by failing to give an instruction limiting the use of this evidence to witness credibility. (*Id.* at p. 1006.)

In this case, by contrast, defendant did not object to the admission of the evidence regarding Linton's, Cyprian's, and Lee's guilty pleas. Indeed, he requested and received a stipulation from the prosecution regarding the dates of the pleas. Thus, far from objecting to the facts of the pleas as prejudicial to

47

defendant, defense counsel sought to incorporate them into the defense case. Because defendant cites no authority that the trial court had a duty to give a limiting instruction on its own motion, and because trial counsel failed to object to the admission of the pleas and failed to request a limiting instruction, we find no merit in this claim.

### 2. Refusal to Allow Questioning Regarding Jury Verdict as to Accomplice Linton

Defendant contends his United States Constitution Sixth Amendment confrontation clause rights were violated because the trial court upheld the prosecutor's objection to defense counsel's questioning of Linton concerning the annulled jury verdicts in his first trial. As we explain below, the trial court did not err in upholding the objection, and defendant's constitutional rights were not violated.

### a. Background

Linton, who was initially charged along with defendant for the capital crimes, was one of the main prosecution witnesses against defendant. Linton pleaded guilty to second degree murder before defendant's trial. When Linton was cross-examined during defendant's trial, defense counsel sought to challenge Linton's credibility by asking him about the circumstances surrounding his acceptance of the plea agreement. Linton acknowledged that he had been charged with two counts of first degree murder for the murders of Barron and Thomas. Linton also acknowledged that he had proceeded to trial on these charges in September 1990. But, when defense counsel asked Linton about the verdict in that first trial, the prosecutor objected on the grounds of relevance. The trial court sustained the objection and then engaged in a sidebar discussion with the parties.

The parties discussed the history of Linton's first trial. There the jury had convicted him of two counts of first degree murder, but the verdict was

subsequently overturned because of jury misconduct. Linton was tried a second time for first degree murder (in January 1991) but, before the jury began to deliberate, the prosecutor agreed to accept Linton's plea of guilty to second degree murder.

Defense counsel stated he wanted to ask about the verdict in Linton's first trial to show that the circumstances surrounding Linton's acceptance of his plea agreement at the second trial reflected an implicit agreement that Linton would testify against defendant. The text of the plea agreement contained no express agreement that Linton must cooperate with the prosecution in a future prosecution of defendant. Nevertheless, defense counsel argued that the guilty verdict in Linton's first trial showed the strength of the prosecution case, and he contended that the prosecutor would not have allowed Linton to plead guilty to second degree murder absent an understanding that Linton would testify against defendant.

The prosecutor responded that he had made no promises to Linton and that the plea agreement clearly stated that the prosecution's offer of a sentence of 15 years to life was "independent of anything [Linton] chose to do later." The prosecutor also stated that, contrary to what defense counsel seemed to assume, it was the prosecutor who had approached Linton about a plea agreement, not vice versa. The prosecutor argued that to ask Linton why he thought the prosecutor was willing to accept a second degree conviction after he had previously obtained a first degree conviction would be to invite speculation.

The trial court agreed that defense counsel's argument concerning the circumstances surrounding Linton's acceptance of the plea agreement was speculative. Accordingly, it allowed defense counsel to ask Linton what he thought was expected of him when he entered into the plea agreement, but cautioned defense counsel not to ask about the verdict in the first trial because this would require an explanation of how the verdict was nullified through jury

49

misconduct. The trial court sustained the prosecutor's objection, stating it did not want defense counsel to leave "an inference in front of the jury as to something that cannot be explained."

Defense counsel resumed cross-examination of Linton and asked him, whether, at the time he entered into the plea, he had "some sort of understanding or belief" that the prosecutor might ask him to testify against defendant. Linton responded that, when he entered into the plea, he understood that the prosecutor might ask him to testify in defendant's case, but that he was not required to do so.

### b. *Analysis*

Defendant contends the trial court erred in sustaining the prosecutor's relevancy objection to the admission of Linton's annulled jury verdict at his first trial. Defendant contends that the definition of relevant evidence is broad enough to include those verdicts. (See Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].) For the reasons explained below, we disagree with defendant's contention.

Defense counsel's argument concerning the relevance of the annulled first degree murder jury verdicts was based on the premise that these verdicts showed the strength of the prosecution case against Linton. Defendant reasoned that because of the strength of the case, both Linton and the prosecutor would have expected Linton to receive the same verdict in his second trial. Defense counsel further reasoned that because of the strength of the prosecutor's case against Linton, the prosecutor was in a strong bargaining position in relation to Linton and would have been able to dictate the terms of a plea agreement, including requiring

50

him to testify against defendant, even though this was never expressly stated in the plea agreement.

We are not persuaded by the highly speculative nature of this argument. The nature of the jury misconduct that necessitated nullification of the verdict is unspecified in this record. Therefore, the fact of the nullified first degree murder verdicts tells us nothing about the strength of the underlying case. Consider, for example, a case in which the verdict was nullified because they were obtained by means of lot. (See § 1181, subd. 4.) The underlying case could have been strong or weak; the verdict in such a case would tell one nothing about the underlying strength of the prosecutor's case precisely because the verdict was arrived at through misconduct, not through the strength of the evidence. The annulled first degree murder verdicts in Linton's first trial therefore do not in themselves tell us anything about the underlying strength or weakness of the prosecutor's case against Linton.[27] Defense counsel failed to show the relevance of the annulled verdicts to his argument for impeaching Linton's account of his acceptance of the plea agreement. The trial court did not err in sustaining the objection.

### 3. Asserted Impugning of the Integrity of Defense Counsel

Defendant contends the prosecutor committed misconduct by denigrating defense counsel during closing and rebuttal arguments. As discussed below, defendant forfeited these claims by failure to object, and, considered on the merits, none of the asserted actions rose to the level of misconduct.

The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury

---

[27] We need not and do not decide whether an annulled jury verdict can ever be relevant legal evidence.

51

commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.) Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*Ibid*.) When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Defendant acknowledges that, concerning all of the instances he now claims to have been misconduct, defense counsel failed to object and request an admonition. Defendant contends that the failure to object should be excused as futile under *People v. Hill* (1998) 17 Cal.4th 800, 821. And yet he fails to show how objecting would have been futile under the circumstances of this trial. Consequently, his claims are forfeited. (*People v. Thompson* (2010) 49 Cal.4th 79, 130.)

Furthermore, were we to consider the claims, we would find them to lack merit. Defendant contends that the prosecutor's opening comments in the closing argument constituted misconduct: "I gave a lot of thought on how to proceed in my closing argument. I had a hard time sleeping last night because part of me really wants to come in here and *attack the defense for the methods which they used to try and mislead you, deceive you, give you false insinuations*. And I

52

started by writing out all the things *that he had done from the beginning in his opening statement, from the defendant, all the way back to when he started trying to falsify evidence.* [¶] And I decided that's not the way to proceed in this case. See, my obligation here is trying to present the truth to the jury. And the truth has a way of coming out when you view everything in totality. So what I'm going to do is I'm going to focus on the case which I presented . . . ." (Italics added.)

Defendant objects to the portions italicized above as attacking the integrity of defense counsel, casting aspersions on him, and suggesting that he had fabricated a defense. (See *People v. Bemore* (2000) 22 Cal.4th 809, 846.) Importantly, however, the prosecutor was referring to actions of both *defendant* and defense counsel. Although his syntax was a bit awkward, the reference to falsifying evidence encompassed defendant's actions or actions that might reasonably be attributed to defendant. As discussed, *ante* at pages 10-11, Raymond Valdez and Kathleen Matuzak testified about defendant's efforts to induce them to fabricate an alibi for him for the night of the killings. Furthermore, *ante* at page 12, after defendant's arrest, defendant's wife called an employee of the pager store to ask her to destroy the paperwork on defendant's pager. The prosecutor's comments about defendant's efforts to falsify evidence were founded on evidence in the record and fell within the permissible bounds of argument. (*People v. Friend* (2009) 47 Cal.4th 1, 32.)

Turning now to the prosecutor's reference to defense counsel's opening statement, we note that this apparently concerned defense counsel's remarks that defendant had been framed for the murders by a police officer named Tony Moreno for whom defendant had worked as an undercover informant. Although no direct evidence was ever presented about Tony Moreno at trial, the issue was raised in various objections entertained by the court. During Cyprian's testimony, outside the presence of the jury, the prosecutor objected under Evidence Code

53

section 352 to defense's counsel's asking Cyprian whether Linton had identified someone named "Tony" as talking to defendant in the bar parking lot. (See *ante,* at p. 5.) The prosecutor argued that defense counsel was attempting to confuse the jury by implying that the "Tony" mentioned by Cyprian was Tony Moreno, even though defense counsel had presented no evidence that this "Tony" was Tony Moreno. The trial court allowed Cyprian's statement regarding Linton's reference to "Tony" to come in based on defense counsel's representation that defendant would testify to Tony Moreno's involvement in the case. Subsequently, defense counsel never called defendant to the stand, never called Tony Moreno to the stand, and failed to produce any evidence indicating that Tony Moreno was involved in the events of the capital crimes. In closing, defense counsel sought to refer to the "Tony" mentioned by Cyprian, and the prosecutor objected based on the trial court's prior ruling and asked the court to strike the reference to "Tony." After reviewing the record, the trial court sustained the prosecutor's objection and granted his motion to strike, finding that mentioning the name "Tony" would be asking the jury to speculate and would create confusion.

The prosecutor therefore had a basis for being concerned that defense counsel would try to get the name of Tony Moreno in front of the jury, even though defense counsel had presented no evidence of Moreno's involvement in the capital crimes. This forms the background of the prosecutor's allusions to defense counsel's attempts to mislead the jury. Indeed, the prosecutor's concern proved prescient when, as described above, defense counsel did try to do exactly that during closing argument.

In any event, the prosecutor's comments did not rise to the level of misconduct. The prosecutor quickly shifted from the theme of defense deception and focused on "the case which I presented," namely, evidence of defendant's guilt. The same analysis also applies to the following passage of the prosecutor's

54

argument: "And his defense, when he stood up in opening argument, is my client wasn't there. The only thing for you to decide, was my client there. So, that's what I'm going to focus on. He says his client wasn't there. I say he's lying." Although the prosecutor did state "I say he's lying," his remarks are reasonably understood as a comment on the weakness of the defense evidence, which the prosecutor went on to discuss.

Finally, defendant claims the following comment in the prosecutor's rebuttal constituted misconduct: "You see, the problem for defense counsel and for his client is he can't change the phone records. He can't deceive the phone records. He can't manipulate them. He can't confuse them. He can't cross-examine them because . . . they speak for themselves." The prosecutor's statements were in response to defense counsel's assertion during closing argument that the telephone records for the apartment where the killings occurred showed no calls "after the afternoon." The prosecutor rebutted this comment by noting that Cyprian had testified that he had called someone from that apartment's phone just before the shooting and that the telephone records showed a call at 9:05 p.m. The prosecutor's remarks constituted fair comment on the evidence, and fell within the permissible bounds of argument. (*People v. Friend, supra*, 47 Cal.4th at p. 32.)

### 4. References to Facts not in Evidence

Defendant contends the prosecutor engaged in misconduct by referring to inadmissible hearsay and facts not in evidence. Defendant's claims involve references to records from New York hotels that were never admitted into evidence. As we conclude below, none of the references constituted misconduct.

As described, *ante* at pages 9-10, Cyprian testified that, after the killings, he and defendant flew to New York where they registered at the Hotel Stanford under the names Michael and Mark Cole. The prosecutor obtained a copy of the Hotel

Stanford registration card, which he intended to introduce into evidence.**28**  The prosecutor also obtained copies of hotel records of calls made from the room registered to Michael and Mark Cole.  The admissibility of the hotel registration card and the hotel phone records was first raised during the prosecutor's case-in-chief when he was questioning Shelia Jones, the aunt of defendant's wife, concerning whether she had received any telephone calls from defendant from the Hotel Stanford in New York.  Defense counsel objected to this line of questioning, and at a sidebar proceeding stated he objected to the introduction of the registration card and other writings from New York in the absence of any foundation to authenticate them as falling under the business records exception to the hearsay rule.  The prosecutor responded that he intended to produce an employee from the Hotel Stanford to authenticate the hotel records, but that he did not intend to use the records in questioning Jones beyond asking her whether she had received telephone calls from defendant.  Defense counsel objected to any reference to the phone records in front of the witness, but suggested that the prosecutor could write down the information on a legal pad and refer to that.  The jury was sent out while the prosecutor copied the information.  Thereafter, the jury returned and the prosecutor resumed questioning Jones.  She denied receiving telephone calls from defendant on January 4 or 5, 1990, stating that she was out of town at that time.

---

**28**    The prosecutor described some details from the Hotel Stanford registration card during his opening statement.  Defense counsel did not object.  Defendant does not assert that this description of the card in itself constituted misconduct, although, as discussed below, he contends that this ultimately misled the jury because the card was never admitted into evidence.

Defendant contends the prosecutor committed misconduct by improperly displaying the phone records within view of the jury, pulling them out of the envelope, and permitting the jury to infer that the prosecutor would be offering documentary evidence to underscore his assertions. What the record shows, however, is that the prosecutor initially had some telephone records in his hands and may have started to refer to them during his examination of Jones, but he did not complete his question, did not have the records in his hands for more than a few moments, and placed the items into an envelope after defense counsel objected. We discern no misconduct in this.

The next instance at trial in which the hotel records were raised was during Cyprian's testimony that, after the killings, he and defendant stayed at a Travelodge before flying to New York. The prosecutor sought to have Cyprian identify a receipt from the Travelodge. In a sidebar proceeding, defense counsel objected to the prosecutor's questioning Cyprian about the Travelodge receipt until it could be authenticated. Defense counsel also objected to the prosecutor's asking Cyprian about a photographic enlargement of the Hotel Stanford receipt that the prosecutor had brought to court and was apparently prepared to display to the jury on a bulletin board. Defense counsel acknowledged that the prosecutor could ask Cyprian if he had registered at either the Travelodge or the Hotel Stanford, but objected to the introduction of any registration documents unless Cyprian testified to personal knowledge of registering. The trial court agreed to allow the prosecutor to proceed in this way. The prosecutor questioned Cyprian about registering at the Travelodge and the Stanford, but Cyprian stated he could not remember watching defendant fill out any registration paperwork at either hotel.

Defendant contends the prosecutor committed misconduct by "repeatedly displaying the Hotel Stanford registration card blowup in open court before the

57

jury." But the record does not support defendant's contention. Defense counsel phrased his objection at trial as follows: "The objection *would be* to asking this witness any questions about the contents of that writing [i.e., the Travelodge receipt] *or putting that blowup on the bulletin board.*" (Italics added.) This phrasing indicates that the prosecutor had either not yet displayed the enlargement to the jury or had just very recently put it up. The record therefore does not support defendant's contention that the enlargement was displayed for the jury for weeks during the trial. Defendant points to the prosecutor's later statement that he had the enlargement in court "every day since the proceedings began." But taken in context, the prosecutor was stating that he had brought the enlargement to court every day — not that he had continuously displayed it to the jury every day.[29] We therefore discern no misconduct.

The Hotel Stanford registration card was next mentioned at trial during the testimony of Robert Greenwood, a handwriting expert who testified for the prosecution. On cross-examination, defense counsel raised the issue by questioning Greenwood about any documents he had reviewed that he had been unable to conclude were written by defendant. Greenwood mentioned the Hotel Stanford registration card as one such item, and defense counsel proceeded to ask Greenwood about his comparisons of the signature on this registration card to other documents. On redirect examination, the prosecutor asked Greenwood about the Hotel Stanford registration card, and Greenwood clarified that he had never attempted to compare the signature on it to any other documents because it was

---

[29] As discussed below, the reason the prosecutor brought the enlargement to court every day was because defense counsel had represented that defendant was going to testify; the prosecutor was waiting until defendant took the stand to question him about the hotel registration card.

crammed into a small signature box on the registration form. Defendant contends that the prosecutor committed misconduct by eliciting testimony concerning inadmissible evidence. We discern no misconduct. The prosecutor's redirect examination briefly touched on the Hotel Stanford registration card only because defense counsel had first raised and pursued it during defense cross-examination.

The issue of the Hotel Stanford registration card was raised one final time, after the defense had rested its case and the prosecutor was preparing to present his rebuttal. The defense requested an offer of proof as to the rebuttal. The prosecutor stated that he was planning to produce the custodian of records from the two hotels at which defendant had stayed in New York (the Hotel Stanford and the Aberdeen Hotel) to authenticate the hotel registration cards. The prosecutor stated that he decided not to present this evidence during his case-in-chief because he had relied on defense counsel's representations that defendant would testify. He explained that he decided to save the expense of flying witnesses from New York to California by first attempting to get defendant to authenticate the registration forms during cross-examination. Because defendant never took the stand, the prosecutor now wanted to authenticate the records during his rebuttal case. Defense counsel objected to the presentation of this evidence during rebuttal, and the trial court agreed. The prosecutor then requested to reopen his case-in-chief to present the evidence, which the trial court also denied.

In the course of arguing that he should be allowed to present the authenticating evidence about the registration cards, the prosecutor reminded the court that he had mentioned at least one of the registration cards during his opening statement and that it would be misleading the jury if the prosecution was not allowed to present the authenticating evidence during the rebuttal case. Defendant points to this comment as a concession that the prosecutor's failure to admit the New York hotel receipts into evidence after mentioning them in opening

59

statement was misconduct because it misled the jury. But the prosecutor was not conceding that he had committed misconduct. Rather, he was trying to convince the trial court of the importance of allowing him to present evidence that he possessed, but which, for tactical reasons, he had not presented in his case-in-chief. Defendant also points to the prosecutor's later comment during the new trial motion that his decision not to produce the custodian of records for the New York hotels during his case-in-chief was a "tactical error." Once again, this was not a concession of misconduct, but rather the prosecutor's appraisal of his decision to rely on defense counsel's representations that defendant would testify. In any event, we see no possible prejudice to defendant. The prosecutor's admitted tactical error had the effect of hurting only the prosecutor's case.

### 5. *Instructions on Flight, and Instructions on Fabricating and Suppressing Evidence as Evidence of Guilt*

At the prosecutor's request, the trial court instructed the jury pursuant to CALJIC Nos. 2.04, 2.06, and 2.52, which state that efforts to fabricate and suppress evidence may be considered circumstances tending to show consciousness of guilt and that flight after the crime may be considered in light of all proved facts in deciding guilt or innocence. Defendant contends these instructions violated the due process clause of the Fourteenth Amendment to the United States Constitution because they allowed the jury to draw arbitrary inferences from the evidence of defendant's flight and efforts to fabricate an alibi. As defendant acknowledges, we have previously rejected this and related claims, and we decline defendant's request to reconsider our past decisions. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 127-128.)

60

*6. Challenges to the Accomplice Testimony and the Robbery-murder*
   *Special-circumstance Allegation*

*a. Adequacy of CALJIC No. 3.11*

As described, Linton, Cyprian, and Lee, defendant's accomplices, testified against him at trial. The trial court instructed the jury in accordance with the full set of standard jury instructions on accomplices.[30] Defendant challenges the adequacy of CALJIC No. 3.11 (5th ed. 1988), which stated: "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense." As defendant acknowledges, the language of CALJIC No. 3.11 closely tracks that of section 1111, which governs the treatment of accomplice testimony and states: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Defendant contends that CALJIC No. 3.11 omits another requirement that we have frequently articulated concerning accomplice corroboration, namely that the corroborating evidence " ' "must relate to some act or fact which is an element of the crime." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) Defendant contends that the reference to an "element of the crime" makes this a more demanding standard than the one set out in CALJIC No. 3.11.

Defendant presents no authority for this argument. Our statement that the corroborating evidence must " ' "relate to some act or fact which is an element of

---

[30]   The jury was instructed in accordance with CALJIC Nos. 3.10 to 3.14, 3.18, and 3.19, which defined "accomplice," instructed the jury to determine whether Linton, Cyprian, or Lee were accomplices, and set forth the standard for determining whether accomplice testimony was corroborated.

the crime" ' " (*People v. Zapien, supra,* 4 Cal.4th at p. 982) means no more than the evidence must "tend[] to connect [the] defendant with the commission of the offense," as stated in CALJIC No. 3.11. As we have further stated in explaining the corroboration requirement, " ' "it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged," ' " and " '[t]he requisite corroboration may be established entirely by circumstantial evidence.' " (*People v. Zapien*, *supra*, 4 Cal.4th at p. 982.) We therefore find no merit in defendant's claim that CALJIC No. 3.11 inaccurately or inadequately states the law on accomplice corroboration.

### b. Adequacy of the Corroborating Evidence

Defendant contends the prosecutor presented insufficient evidence to corroborate the accomplices' testimony regarding the robbery. We conclude that the prosecution presented sufficient corroborating evidence.

The law on the corroboration of accomplice testimony is well established: " 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505.) " 'The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime.' " (*Ibid*.) "The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.)

Ample, and indeed very strong, evidence corroborated the testimony of Linton, Cyprian, and Lee and connected defendant with the robbery. The telephone records between defendant's home and the victims' place of employment, A.R.A., corroborated the accomplice testimony that defendant set up the drug deal with the victims. This also was corroborated by the testimony of an A.R.A. employee who overheard the victims say they were going to a bar to transact a drug deal. Additionally, Jose Pequeno, who was working at the bar that night, testified that the victims were there and talked to someone who looked like defendant. The two neighbors of the Spring Street house crime scene, Irma Sazo and Marcella Pierre saw defendant, Cyprian, Linton, and Lee exiting the apartment where the robberies occurred. Defendant's pager was found at the crime scene. Defendant's fingerprints were found in the room where the victims had been shot and on the truck to which the victims' bodies had been dragged. The victims' wallets were found in the kitchen cabinet at the crime scene, corroborating the accomplice testimony that the wallets were taken from the victims before they were killed.

Furthermore, evidence of defendant's flight after the crimes were committed supports an inference of consciousness of guilt and constitutes an implied admission, which may properly be considered as corroborative of the accomplice testimony. (*People v. Zapien*, *supra*, 4 Cal.4th at p. 983.) The nonaccomplice evidence that corroborated defendant's flight includes the Travelodge receipts showing that defendant did not go home after the crimes and the telephone records showing that no telephone calls were made on defendant's home telephone from January 3, 1990, through January 15, 1990. Defendant's consciousness of guilt was further shown by the testimony of the nonaccomplice witnesses Raymond Valdez and Kathleen Matuzak, who testified about defendant's attempts to induce them to fabricate an alibi for him for the night of the killings.

### c. Attempted Robbery Theory of the Robbery-murder Special Circumstance

The prosecution argued to the jury that a true finding on defendant's robbery-murder special-circumstance allegation could be based on either of two robbery theories: (1) the completed robberies of the victims' wallets or (2) the attempted robbery of the cocaine, which was the transaction defendant was engaged in when he sought to compel Barron at gunpoint to tell his associates to deliver the drugs. Defendant contends that the prosecutor's use of this second theory to support the special circumstance violated defendant's rights because he was not given notice of it in the charging document and because the trial court failed to instruct the jury that it must unanimously determine the basis for the finding. As we conclude below, defendant's rights were not violated.

### (1) Background

The information charged defendant with two counts of murder and two counts of robbery. Regarding the two murder counts, the information alleged a special circumstance under section 190.2, subdivision (a)(17) — that is, murder while "engaged in the commission of the crime of robbery within the meaning of Penal Code section 190.2(a)(17)." (*Ibid.*) Penal Code section 190.2, subdivision (a)(17) in turn states this special circumstance applied to murders committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," a robbery.

During trial, Linton and Lee testified that the victims' wallets were taken from them before they were killed. In addition, the prosecution also introduced evidence of an attempted robbery. As described, *ante* at pages 6-7, defendant put a gun to the head of Barron and told him to convince his associates over the phone that they should deliver the drugs to defendant. It was during the course of dialing

the phone that defendant discharged the first, apparently accidental, shot, wounding Barron, after which defendant followed with a second shot killing Barron.

During a discussion about proposed jury instructions, the prosecutor stated that the robberies charged in counts three and four were based on the taking of the victims' wallets. He also asserted that the jury could use the attempted robbery of the cocaine as a basis for finding true the robbery-murder special-circumstance allegation. The prosecutor therefore requested instructions on constructive possession. Defense counsel objected to that instruction and to any instruction based on either theory of robbery (that is, both the completed robbery of the wallets and the attempted robbery of the cocaine), citing a purported lack of evidence to support either. The trial court ruled there was sufficient evidence to support the instructions.

During his closing argument, the prosecutor turned to the robbery-murder special-circumstance allegation, describing both the robbery of the wallets and the attempted robbery of the cocaine. He characterized them as "two robberies actually occurring at the same time" and argued that the jury could rely on either to find the felony-murder special-circumstance allegation true.

### (2) Asserted Lack of Notice

Defendant contends he did not have sufficient notice that the special circumstance allegation could be based on attempted robbery because that crime had not been charged in the information. Initially, we note that defendant has forfeited the claim for failure to object below. (*People v. Cole* (2004) 33 Cal.4th 1158, 1205.) As recounted, defense counsel did object to all the instructions based on robbery according to either theory. His objection, however, was based on the contention that insufficient evidence supported either theory of robbery; he did not

65

object on the basis that attempted robbery had not been alleged or that he received inadequate notice.

We also reject defendant's claim on the merits. "Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them." (*People v. Seaton, supra,* 26 Cal.4th at p. 640.) Defendant received adequate notice that the robbery-murder special-circumstance allegation could be based on robbery or attempted robbery. As described above, the information referenced section 190.2, subdivision (a)(17), which includes attempted robbery. Furthermore, even assuming for the sake of argument that the information provided inadequate notice on this point, defendant received notice of the facts underlying the attempted robbery theory at his preliminary hearing, which we have stated generally provides adequate notice of the prosecutor's theory. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1205.) At the preliminary hearing, Lee testified to the same essential facts about the attempted robbery of the cocaine; namely, that Barron was bound and defendant told him to call "his people" to deliver the narcotics while threatening him with a gun. At trial, defendant was given notice of the attempted robbery theory by Linton's testimony and the discussions about jury instructions. This was not a case, therefore, "in which the prosecution ambushed the defense" with a theory. (*Id.* at p. 1206.)

### *(3) Asserted Lack of Unanimity Instruction*

Defendant contends the trial court erred by failing to instruct the jury that it must unanimously decide which robbery offense — the completed robbery of the wallets or the attempted robbery of the cocaine — supported the robbery-murder special-circumstance allegation. We have explained that a " 'unanimity

66

instruction is not required when the acts alleged are so closely connected as to form part of one transaction.' " (*People v. Benavides* (2005) 35 Cal.4th 69, 98.) Specifically, "[t]he 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.) Here, as in *Benavides*, in which we applied the continuous conduct rule, the "criminal acts . . . took place within a very small window of time." (*People v. Benavides*, *supra,* at p. 98.) The testimony supported the prosecutor's characterization of the event as "two robberies actually occurring at the same time." Defendant did not offer a defense based on a showing that he committed either the attempted robbery or the completed robbery, but not both. Rather, his defense was that he was not present at the scene of the crime and therefore played no role whatsoever in any of the crimes committed there. A unanimity instruction therefore was not required. (*Ibid*.)[31]

## C. Penalty Phase Issues

### 1. Colloquy Concerning Self-representation

Defendant contends the trial court gave him materially inaccurate information that adversely affected his decision whether to represent himself at the penalty phase. We conclude that the trial court engaged in a proper colloquy with defendant concerning the dangers of self-representation, and no error occurred.

---

[31] Defendant also contends that the trial court erred in failing to instruct the jury that it must unanimously agree on whether the underlying felony for the theory of felony murder was a robbery or an attempted robbery. We have held that, although "a jury must unanimously agree that the defendant is guilty of the statutory offense of first degree murder beyond a reasonable doubt . . . it need not decide which of several proffered theories of first degree murder liability governs the case." (*People v. Lewis* (2001) 25 Cal.4th 610, 654.)

### a. Background

After the verdicts were read in the guilt phase, defense counsel informed the court and the prosecutor, outside the presence of the jury, that defendant wished to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806.  Defense counsel explained that defendant did not want him to produce any mitigating evidence, and had instructed him in the strongest possible terms not to call any family members to testify.  Defense counsel also explained that defendant had lost confidence in him as an attorney because he had not proved defendant was not the shooter, had talked defendant out of testifying, and had failed to produce Tony Moreno as a witness.[32]  The trial court stated it would not make an immediate ruling on the *Faretta* motion, but scheduled a hearing for the next morning, and asked defendant to consult his family about the wisdom of such a decision in the meantime.

At the hearing, defendant confirmed that he wanted to represent himself.  He expressed disappointment that he did not get everything he wanted in the trial, noting that he had not testified on his own behalf and that Moreno was not called to testify.  He felt that the penalty phase was scheduled to start too quickly (just after he had been found guilty) and he did not want to "throw his family up on the stand" because they were not ready for it.

The trial court engaged in a colloquy with defendant about the dangers of self-representation.  It noted that his attorney had taken the case for the entire trial and had announced that he was prepared to go forward.  The court observed that it did not make any sense to dismiss counsel at this important point of the trial, especially in light of the difficulties that defendant would face in trying to prepare

---

[32]    For discussion concerning Tony Moreno, see part D., *post*.

himself for the penalty phase. It further stated that defense counsel knew all about the case and had done "a great job." Defendant had an off-the-record discussion with defense counsel, and then told the court he would retain defense counsel for his representation.

### b. Analysis

Pointing to the trial court's statements that defense counsel knew about the case, was prepared to move forward, and was prepared for the penalty phase, defendant contends the court gave him materially inaccurate information that adversely affected his decision whether to represent himself. Incorporating arguments from his claims of ineffective assistance of counsel set forth in his related petition for writ of habeas corpus, he contends that none of the trial court's statements about counsel were accurate. As discussed in part D., *post*, defendant's petition for writ of habeas corpus is the appropriate avenue for resolution of such claims. We reject defendant's attempt here to incorporate those claims as background material that the trial court did not know and could not have known at the time it engaged in what we view as a proper colloquy with defendant regarding the dangers of self-representation.

That said, we also conclude the trial court's opinions were not inaccurate. They were observations, based on defense counsel's representations, that were certainly true in a general sense: counsel did know about the case and he was willing and able to prepare the penalty phase. Defendant also contends that the trial court's description of defense counsel as having done "a great job" was misleading. But, once again, the trial court's statement was a general description based on its own observations. In *People v. Jenkins, supra,* 22 Cal.4th at pages 958-963, we discussed a defendant's contention that the trial court coerced him into withdrawing his motion for self-representation. As in *Jenkins*, we

69

likewise conclude that, instead, the record supports a conclusion that "the court properly advised defendant of the pitfalls of self-representation." (*Id*. at p. 961.) We therefore find no error in the trial court's colloquy with defendant.

### 2. *Claims Concerning Factor (b) Evidence*

As described *ante* at pages 17-19, the prosecutor presented four instances of prior violent criminal acts as evidence in aggravation under section 190.3, factor (b): (1) an assault on Kenneth Moore; (2) the firing of gunshots at Officer Sims; (3) robbery and assault on Mona Thomas and her father; and (4) possession of a concealed weapon. Defendant makes various arguments against the use of this evidence, all of which he forfeited by failing to raise them below (*People v. Burgener, supra,* 29 Cal.4th at p. 867), with the exception of his jury instruction claim, which requires no objection. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) We also reject each claim, below, on the merits.

### a. *Statute of Limitations*

Defendant contends that, by the time of trial, the statue of limitations had run on the Kenneth Moore and the Officer Sims incidents, and that their use therefore violated his right to due process and the Eighth Amendment to the United States Constitution. Defendant acknowledges that we have held that section 190.3, factor (b) evidence "is not subject to exclusion on the ground that prosecution for those acts would be barred by a statute of limitations" (*People v. Heishman* (1988) 45 Cal.3d 147, 192) but requests that we reconsider our holding. We decline to do so.

### b. *Asserted Violation of Double Jeopardy*

Defendant notes that he pleaded guilty to misdemeanor assault in connection with the assault on Kenneth Moore, and contends the prosecutor violated the double jeopardy clause of the federal Constitution by presenting testimony of the incident at defendant's penalty phase. Defendant acknowledges that in *People v.*

*Melton* (1988) 44 Cal.3d 713, 756, footnote 17, we concluded that double jeopardy does not apply "when the details of misconduct which has already resulted in conviction or punishment, or in dismissal pursuant to a plea bargain . . . are presented in a later proceeding on the separate issue of the appropriate penalty for a subsequent offense." (Italics omitted.) Defendant requests that we reconsider our holding. We decline to do so.

### c. Accomplice Liability as the Basis for Factor (b) Crimes

Defendant contends that some of the evidence the prosecutor introduced concerning the section 190.3, factor (b) crimes concerned actions committed not by defendant, but by others. He points to evidence that Eddie Jackson was the person who shot and killed Kenneth Moore. He also points to evidence that an unidentified person assaulted Mona Thomas and her father with a brick. He contends the introduction of this evidence was improper because the Legislature did not intend to authorize accomplice liability for factor (b) crimes. He acknowledges that in *People v. Hayes* (1990) 52 Cal.3d 577, 633, we stated: "Evidence that a defendant in a capital punishment case has previously aided and abetted a violent criminal offense is admissible under the language of factor (b) of section 190.3, whether or not the defendant's actions were themselves violent," and he requests that we reconsider our holding. We decline to do so. As we have further stated: "The sentencer in a capital proceeding is entitled to know about other incidents involving the use or threat of violence for which the defendant is shown to be criminally liable beyond a reasonable doubt, whether he participated as an actual perpetrator or in some other capacity." (*People v. Ray* (1996) 13 Cal.4th 313, 351.)

71

### d. Asserted Misinstruction on Accomplice Liability

Defendant contends that, even if accomplice liability is appropriate under section 190.3, as we held in *People v. Hayes*, *supra,* 52 Cal.3d at page 633, the trial court misinstructed the jury on the principles of accomplice liability. As described below, at defense counsel's request, the trial court altered the phrasing of CALJIC No. 8.87, which defendant now contends had the result of misinstructing the jury on the principles of accomplice liability. We conclude that, although the altered version of CALJIC No. 8.87 was ambiguous, there was no reasonable likelihood the jury applied the instruction in the complained of manner.

### (1) Background

CALJIC No. 8.87 is the standard jury instruction for section 190.3, factor (b) crimes, and at trial, in relevant part, was given as follows: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts or activity [list of acts ] which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts or activity."

Before closing argument in the penalty phase, the parties discussed jury instructions, and defense counsel questioned the applicability of this standard instruction to the four section 190.3, factor (b) acts for which the prosecutor had presented evidence. Specifically, defense counsel argued the standard instruction did not apply to two of the acts, namely, the shots fired at Officer Sims and the assault on Mona Charles and her father. He argued that the evidence supporting those two acts amounted to only a suspicion that defendant was "involved" in them, as opposed to showing that he had "committed" them. Counsel therefore requested a change in the wording of the instruction. The prosecutor objected to

72

defense counsel's request, arguing that circumstantial evidence showed defendant had committed the two acts at issue.[33]  The trial court suggested amending the instruction to refer to acts that defendant "has committed *or was involved in*."  (Italics added.)  The prosecutor agreed to the trial court's amendment.

The trial court subsequently instructed the jury as follows (italics added): "Evidence has been introduced for the purpose of showing that the defendant . . . has committed *or was involved in* the following criminal acts or activity . . . [list of acts] . . . which involved the express or implied use of force or violence or the threat of force or violence.  Before a juror may consider any of such criminal acts or activity as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant . . . did in fact commit such criminal acts or activity *or was involved in such criminal acts or activity*."

*(2)  Analysis*

Defendant contends that the effect of adding the "or was involved in" language lowered the prosecutor's burden in proving the section 190.3, factor (b) crimes.  He contends the language conveyed that his mere presence at the scene of a crime was sufficient.  He asserts the trial court had a duty to clarify on its own motion the standard for accomplice liability by instructing the jury pursuant to CALJIC No. 3.01, as given, which stated:  "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she:  [¶]  (1) With knowledge of the unlawful purpose of the perpetrator, and [¶]  (2) With the intent or purpose of committing or encouraging or facilitating the commission of

---

[33]     The prosecutor's point appears correct.  The language of the standard jury instruction simply states that evidence has been introduced for the prosecutor's *purpose* of showing that defendant committed the criminal acts.  The jury retains the task of evaluating the prosecutor's evidence.

the crime, and [¶] (3) By act or advice, [or, by failing to act in a situation where a person has a legal duty to act,] aids, promotes, encourages or instigates the commission of the crime." It also informs the jury: "Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting."

As an initial matter, defendant attempts to explain why the claim is not forfeited in view of the circumstance that the alteration to CALJIC No. 8.87 came at the insistence of defense counsel. Defendant contends that, although defense counsel requested "or involved in" be inserted only in the first sentence of CALJIC No. 8.87, the trial court inserted it in both the first and second sentences. He contends that inserting "or involved in" in only the first sentence would not have raised the problems he now complains of. There is some support in the record for defendant's contention that defense counsel intended to have the trial court insert "or involved in" only in the first sentence. The trial court and the parties never expressly addressed the issue of the second sentence. Had they done so, defense counsel would have had to address why the phrase "or involved in" could legitimately be added to the first sentence, but not the second, given that the second sentence precisely addresses the acts mentioned in the first. Furthermore, adding "or involved in" to the first sentence but not to the second would have created its own ambiguities — what burden of proof would apply to those criminal acts introduced for the purpose of showing that defendant was "involved in" them? Was the jury simply to ignore them or could it consider them without any burden of proof?

In any event, assuming the insertion of "or involved in" in the instruction created an ambiguity, we conclude that the trial court had no duty to instruct on its own motion pursuant to CALJIC No. 3.01, nor was there a reasonable likelihood the jury interpreted the jury instruction in the complained of manner. We have

74

repeatedly held that the trial court has no duty, absent a request, to instruct on elements of crimes proved under factor (b). (*People v. Cain* (1995) 10 Cal.4th 1, 72.) Defendant did not request an instruction on the elements of aider and abettor liability in connection with the section 190.3, factor (b) crimes, but he contends that the alteration to CALJIC No. 8.87 gave rise to a duty to so instruct. We disagree: "[T]he instructions were not so vital to the jury's evaluation of defendant's prior actions as to require that they be given without a request." (*People v. Cain, supra,* at p. 72.) As in *People v. Cain,* "the jury had before it evidence and argument from which it could rationally assess the degree of culpability [the] defendant bore in the prior incident. The proper focus for consideration of prior violent crimes in the penalty phase is on the facts of the defendant's past actions as they reflect on his character, rather than on the labels to be assigned the past crimes . . . ." (*Id*. at p. 73.)

Concerning the asserted ambiguity of the instruction, the United States Supreme Court has stated: "[I]n reviewing an ambiguous instruction . . . we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Clair* (1992) 2 Cal.4th 629, 663 [adopting this test for examining instructions under California law]. [34]) Defendant contends alteration of the instruction allowed the jury to find him liable as an accomplice for merely being present at the scene of the crime during the assaults

[34] The high court has applied this analysis to ambiguous instructions at both the guilt phase (*Estelle v. McGuire*, *supra*, 502 U.S. at pp. 67-68) and penalty phase (*Boyd v. California* (1989) 494 U.S. 370, 374 ) of a trial, when those instructions implicated a federal constitutional right. We have applied this analysis to ambiguous instructions at both the guilt and penalty phases, even when the instructions arguably implicated only a state law issue. (See *People v. Rogers* (2006) 39 Cal.4th 826, 873; *People v. Frye* (1998) 18 Cal.4th 894, 957, 1021.)

75

on Kenneth Moore, and Mona Thomas and her father, and during the attempted shooting of Officer Sims. But the prosecutor never made such an argument. Rather, he argued that defendant was a direct participant in the crimes or acted with knowledge and purpose in aiding others in the crimes. (See *Middleton v. McNeil* (2004) 541 U.S. 433, 438 [reviewing court can consider that counsel's arguments clarified an ambiguous jury charge, particularly when the prosecutor's arguments resolve an ambiguity in favor of the defendant].) Regarding the assault on Kenneth Moore, the prosecutor asserted: "He [defendant] is one of the main perpetrators of this attack on this boy [Kenneth Moore]. He's one of the volitional people that is involved in kicking and beating this young boy. But for his and the conduct of all of them collectively this boy never would have been killed because he would have got away. It was the group atmosphere that put him in a position where he couldn't escape, which led to his beating, which led to his death." For the attempted shooting of Officer Sims, the prosecutor argued that the circumstantial evidence showed that defendant was the shooter. For the assault on Mona Thomas and her father, the prosecutor argued that defendant had been one of the participants in the beatings.

Defense counsel's closing argument likewise made clear to the jury that the prosecutor had to show knowledge, purpose, and direct participation or assistance in order for the jury to hold defendant responsible for the section 190.3, factor (b) crimes. Defense counsel's argument was predicated on asserting that the prosecutor had failed to show these things. Regarding the assault on Kenneth More, defense counsel argued that it "was certainly not my client's fault" that Eddie Jackson shot Kenneth Moore: "You've heard no evidence that my client instructed him to do it, encouraged him to do it or even knew that Eddie had a gun in his pocket." Counsel argued that it was "pure speculation" that defendant shot at Officer Sims, in view of the circumstance that Sims did not see who shot at him.

76

Regarding the assault on Mona Thomas, counsel argued there was no proof that defendant "actually committed a crime." Nowhere did either the prosecutor or defense counsel imply that defendant's mere presence at the scene of a crime was sufficient for the jury to find that he was "involved in" the factor (b) crimes. There was no reasonable likelihood, therefore, that the jury construed the challenged instruction in this way. (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.)[35]

### e. Asserted Lack of Notice

In closing argument, the prosecutor argued that defendant's participation in the assault on Kenneth Moore made him as culpable as an actual murderer, even though defendant was only charged with and convicted of misdemeanor assault.[36] Defendant claims he did not receive notice that his involvement in the assault on

---

[35] We likewise reject several subsidiary arguments that defendant asserts concerning the instruction. Defendant's discussion of the unconstitutional vagueness of sentencing factors under *Tuilaepa v. California* (1994) 512 U.S. 967 is inapplicable because the asserted vagueness of section 190.3, factor (b) generally as a sentencing factor is not at issue here; rather the issue is the asserted ambiguity of this particular instruction. (*Tuilaepa*, *supra,* at pp. 976-977 [holding that factor (b) is not unconstitutionally vague.]) We also reject defendant's argument that the instruction violated his right to notice about the penalty phase evidence in aggravation. Defendant received notice of all the incidents that were presented at the penalty phase. Defendant's contention that the instruction's asserted ambiguity expanded the scope of his accomplice liability does not transform these incidents into new ones requiring separate notice.

[36] The prosecutor stated: "[I]t has been minimized ever since 1983 when the defendant was charged and convicted with assault with a deadly weapon for hitting and kicking a boy. What I'm trying to spell out for you as a jury in terms of his true culpability for the crime, he is a murderer. Because if someone dies during the course of a robbery — and that's what I submit was going on here — . . . his culpability for the crime was that of a murderer."

77

Kenneth Moore would be characterized as a murder, and contends that this amounted to lack of notice of a separate section 190.3, factor (b) crime.

Defendant did not object on the asserted ground and has therefore forfeited the claim. (*People v. Farnam* (2002) 28 Cal.4th 107, 175.) Furthermore, we reject the claim on the merits. Defendant acknowledges the prosecutor gave notice of his intent to use the Moore assault at the penalty phase, but argues that the prosecutor surprised him with a *characterization* of that evidence that he could not have anticipated. Defendant presents no authority (and we are aware of none) that the notice requirement of section 190.3 requires a prosecutor to give notice about the precise way he or she will characterize or argue a noticed incident during closing argument. As discussed in the prior part, in his closing argument defense counsel vigorously presented his own characterization of the Moore incident, arguing that defendant should not be considered culpable for Moore's death. We conclude therefore that defendant was given proper notice.

### D. Motion for New Trial Based on Asserted Ineffective Assistance of Counsel

The trial court appointed Attorney Douglas W. Otto to assist defendant's trial counsel, Ronald LeMieux, in preparing a motion for new trial. Otto was assigned to investigate whether LeMieux was ineffective in representing defendant and to prepare a motion for new trial on those grounds. Otto's motion contained declarations from LeMieux, defendant, and others involved in the case. LeMieux also prepared a motion for new trial, which alleged other errors that occurred at trial. After an extensive hearing at which LeMieux, defendant, and several other witnesses testified, the trial court denied the motions for new trial. It found that LeMieux performed competently and that it was not reasonably probable that the jury would have reached a different result based on the asserted errors shown by the testimony at the hearing.

78

On appeal, defendant again contends that LeMieux was ineffective.[37]  To establish such a claim, he must show counsel's representation was "deficient" in that it "fell below an objective standard of reasonableness" (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688) "under prevailing professional norms" (*id.* at p. 688).  In addition, defendant is required to show prejudice from counsel's deficient representation — that is, defendant must demonstrate a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable.  (*Id*. at p. 694.)

Defendant acknowledges that claims of ineffective assistance of counsel are ordinarily best raised and reviewed on habeas corpus, but argues the current case is unusual in that there was a lengthy evidentiary hearing in support of defendant's motion for a new trial, at which counsel testified and filed supporting materials. As an initial argument, defendant contends that pursuant to *United States v. Cronic* (1984) 466 U.S. 648, 659, he does not need to show prejudice because counsel entirely failed to subject the prosecutor's case to meaningful adversarial testing. We reject this contention.  LeMieux gave an opening statement and closing argument, cross-examined the prosecution's witnesses, objected to testimony and exhibits, and presented a number of witnesses on defendant's behalf during the guilt and penalty phases of the trial.  Defendant therefore fails to show a complete lack of adversarial testing under *Cronic*.

Regarding prejudice, defendant acknowledges that the only arguments related to that issue raised at the hearing for the motion for new trial concerned the effect the testimony of Police Officer Tony Moreno would have had if trial counsel had

---

[37]  Defendant does not challenge the trial court's denial of the motion for new trial.

called him as a witness. We discuss the Moreno testimony below and conclude that, based on this record, even if we assume deficiency for the sake of argument, defendant fails to demonstrate prejudice. First, however, we will briefly review defendant's other ineffective assistance claims, which, we reiterate, can be fully addressed only in a habeas corpus petition because they require investigation of evidence outside the record in order to potentially establish prejudice.

### 1. Ineffective Assistance of Counsel Claims

### a. Qualifications to Represent Defendant

Defendant contends LeMieux was deficient because he lacked the legal knowledge and experience to handle a capital case, and lacked an office staff and resources. LeMieux testified that he had practiced law (predominantly criminal law) for 20 years before representing defendant. Although he had handled capital cases before representing defendant, he had never litigated a penalty phase in those cases because the defendants were either acquitted or their cases ended in a plea. He had not received any special training in capital case work through courses, lectures, or attending conferences, although he owned manuals from the California Public Defender's Association death penalty conferences. At the time of defendant's trial, LeMieux was practicing out of his house and had a small library of law materials. He used a local law library for additional materials. He did not have a secretary, a paralegal, or any kind of support staff.

Although LeMieux had not previously handled a capital case that resulted in a penalty phase, this does not in and of itself establish deficient performance. (See *People v. Wright* (1990) 52 Cal.3d 367, 412-413.) The admission of an attorney to the state bar establishes that the state deems him competent to practice law in all types of actions, and, when a defendant is represented by a licensed attorney, a

presumption exists in favor of the effectiveness of counsel. (*People v. Majors* (1998) 18 Cal.4th 385, 430-431.)

Defendant puts great emphasis on the fact that LeMieux failed to conform to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. These guidelines were adopted in 1989, two years before LeMieux's representation of defendant. Among other things, the guidelines include recommendations for staffing and for specialized training in death penalty cases. As we have recently noted, however, the guidelines "are not congruent with constitutional standards for effective legal representation." (*In Re Reno* (2012) 55 Cal.4th 428, 467.) We have also noted that the United States Supreme Court criticized the Sixth Circuit for treating the guidelines " 'not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel " 'must fully comply.' " ' " (*Id.* at p. 468 citing *Bobby v. Van Hook* (2009) 558 U.S. 4, 17 (*per curiam*).) We therefore reject defendant's argument that failure to conform to the guidelines is sufficient to establish deficient performance by counsel.

Defendant also contends that LeMieux was deficient for hiring an associate attorney, Douglas McCann to exclusively conduct jury selection. McCann alone conducted jury selection; LeMieux was not present during any of it. Defendant fails, however, to show that McCann was deficient or that LeMieux was therefore deficient in hiring him. LeMieux testified that he hired McCann because he had previously worked with him and regarded him highly. LeMieux discussed capital case jury selection with McCann, reviewed typical voir dire questions, and provided him materials. According to McCann's declaration submitted for the new trial motion, although he had never previously handled a death penalty case, he had worked for the Los Angeles County Public Defender's Office and, after establishing a solo practice specializing in criminal law, he had handled a number

81

of felony cases, including at least two murder cases.  As discussed above, we presume the effectiveness of a licensed attorney.  (*People v. Majors*, *supra*, 18 Cal.4th at p. 431.)

### b.  Asserted Failure to Investigate

Defendant contends that LeMieux's performance was deficient because he failed to undertake sufficient investigation.  Defendant points to the fact that LeMieux did not seek court funding of cocounsel or an investigator.  Although LeMieux retained the services of an investigator from defendant's previous attorney on the case, defendant contends he did not utilize his investigator sufficiently.  Defendant contends that LeMieux should have hired experts to analyze the physical evidence in the case.  Defendant contends LeMieux was deficient because he failed to interview any of the guilt phase witnesses prior to trial, including the ones he called for the defense.  Although defendant acknowledges that LeMieux had several discussions with defendant's parents to gain information about defendant's background for the penalty phase, defendant contends that LeMieux should have spent more time talking to members of defendant's family before having them testify at the penalty phase.

In all these areas, on this record, even if we assume deficiency for the sake of argument, defendant fails to show prejudice.  No evidence was produced at the hearing on the motion for new trial regarding the evidence that LeMieux would have uncovered had he done further investigation in the manner defendant urges above.  Defendant's contentions must therefore be raised in a habeas corpus petition.

### c.  Counsel's Physical and Mental State During Trial

Defendant contends that LeMieux was ineffective because he was subject to medical problems during the trial.  LeMieux testified at the motion for new trial

that he did not take notes while in court because he had a tremor in his arms that left him unable to write. He would instead rely on his memory of the day's testimony and type a summary of the testimony in the evening. Defendant also contends LeMieux's performance at trial was adversely affected because of stress in his personal life. He had just remarried and faced stress in mediating between his children and the children of his new wife. He also was being investigated by the State Bar for mishandling of client funds in approximately a dozen cases. The investigation spanned the full tenure of his representation of defendant. LeMieux testified to suffering from panic attacks that would occur at least once a week during the trial.

Once again, defendant can establish these claims only on habeas corpus. LeMieux's testimony highlighted factors that *might* have caused his representation to be deficient. Defendant's claim is that an undistracted and unstressed counsel would have done something during trial that the distracted and stressed LeMieux failed to do. But this is essentially a restatement of defendant's claim that LeMieux failed to investigate and prepare the case adequately. The record on appeal does not reveal what evidence LeMieux failed to present or how the presentation of such evidence would have resulted in a more favorable determination for defendant. Defendant's contentions therefore must be raised in a habeas corpus petition.

### 2. *Ineffective Assistance of Counsel Claims Involving Tony Moreno*

The hearing on the motion for new trial focused on Anthony (Tony) Moreno, a Los Angeles County police officer with whom defendant had worked as an informant. LeMieux testified that he first became aware of defendant's relationship with Moreno when, about three weeks before opening statement, the prosecutor sent him an F.B.I report describing an interview between defendant and

an F.B.I. agent concerning the prosecution of certain sheriff's deputies and police officers in narcotics skimming cases.

LeMieux explained that he decided to discuss Moreno in his opening statement even though he had not yet interviewed him, served him with a subpoena, or investigated the facts of defendant's activities as an informant. LeMieux based his discussion of Moreno in his opening statement on the F.B.I. report and on his conversations with defendant. In the opening statement, LeMieux told the jurors that defendant had been an informant working for the Los Angeles County Sheriff's Department and the Los Angeles County Police Department, and defendant had set up narcotics deals for various officers, including one named Tony Moreno. LeMieux told the jury to "write that name down" and stated that they would learn more at trial about how defendant worked very closely on a day-to-day basis with Moreno.

After the opening statement, LeMieux attempted, both personally and through an investigator, to subpoena Moreno, but was unsuccessful. LeMieux testified that he did not consider asking the trial court for a continuance to secure Moreno. He believed that the best way to proceed under the circumstances was to present a reasonable doubt defense. LeMieux produced no evidence pertaining to Moreno at trial, although, as discussed, *ante* at pages 5 and 53-55, he convinced the trial court to admit Cyprian's testimony that Linton had mentioned that someone named "Tony" was present at the bar parking lot.

Moreno testified at the hearing on the motion for new trial, and his testimony is discussed in detail below.

### a. Discussing Tony Moreno During Opening Statement

Defendant asserts LeMieux performed deficiently by discussing Moreno during the opening statement and emphasizing his importance to the case, but then

84

failing to produce any evidence during trial on this issue. Defendant contends that this circumstance alone is sufficient to establish prejudice, yet he fails to provide authority for this proposition. Defendant is required to demonstrate prejudice by indicating what evidence defense counsel did not present about Tony Moreno that would have made it reasonably probable that the results of the guilt and penalty phases would have been different.

### b. Failure to Present Tony Moreno at Trial

Based on the testimony of Tony Moreno at the hearing on the motion for new trial, defendant contends that, if LeMieux had called Moreno to testify, it is reasonably probable that the outcome of the guilt and penalty phases would have been different. We conclude that, even assuming LeMieux performed deficiently for failing to produce Moreno at trial, defendant fails to establish prejudice.

### (1) Testimony at the Motion for New Trial

Detective Anthony R. Moreno testified that he was employed by the Los Angeles Police Department and, in January 1990 (the time of the killings), he was assigned to the Organized Crime Intelligence Division, where his specialty was "black organized crimes," including gangs. Moreno had known defendant since 1987, but it was not until the middle of 1988 that he began using him as an informant. On at least one or two occasions, Moreno picked up defendant at defendant's home. Defendant contacted Moreno by paging him. Sometimes defendant would page him as often as every day for several days in a row, but there were periods in which defendant did not page him at all. Moreno would sometimes return defendant's pages.

Moreno did not recall being with defendant on January 2, 1990 (the date of the killings). Although he had no independent recollection of where he was that

85

day, his log indicated that he went to a "Protective League" meeting and then spent approximately five and a half hours undertaking administrative duties.

On February 7 or 8, 1990, defendant paged Moreno. When Moreno phoned him back, defendant told him he was concerned about his safety because some homicide detectives were looking for him. Moreno contacted the detectives, and then told defendant to select a location where he wanted to surrender. Defendant chose to be arrested at his mother's house. Moreno was not involved in making the arrest. After the arrest, South Bureau homicide detectives called Moreno on February 8, 1990 and, at their request, he visited defendant in custody. Moreno was at the South Bureau station for about three and one-half hours. One of the homicide investigators requested that Moreno stay, so that he could assist if defendant named people that Moreno knew. At some point, Moreno spoke with defendant for 10 to 15 minutes, and may have talked with him a second time.

On cross-examination, the prosecutor questioned Moreno about the truth of the following statements that defendant made in a declaration after his conviction and sentence of death: At the end of 1989 and the first two days of 1990, defendant helped set up a drug deal with Willie Thomas, Jack Barron, Patrick Linton, Dauras Cyprian, and himself. Defendant told Moreno about the drug deal and that they agreed to "rip off" the "dope" and divide it between themselves. On January 2, 1990, he and Moreno were driving in the vicinity of the Spring Street House, where the deal was supposed to take place. They saw Barron and Thomas pull up close to the Spring Street House in a car, park, get out of the car, and walk to the apartment. Moreno then got a tool from the trunk of his car, broke into

86

Barron and Thomas's car and stole three kilos of cocaine, which Moreno and defendant divided between them.**38**

Moreno denied the truth of any of the above statements. He testified that he had no personal knowledge of any fact, event, or circumstance leading to or involving the death of either Barron or Thomas, or of any crime that took place at the Spring Street House on January 2, 1990. He further testified he had no personal knowledge of the involvement or lack of involvement of defendant in the capital homicides.

*(2) Analysis*

Defendant contends that if Moreno had testified at defendant's trial as he did at the hearing on the motion for new trial, the outcome of the guilt phase likely would have been different. We conclude there is no reasonable likelihood that Moreno's testimony at the new trial motion, if delivered at trial, would have changed the outcome of any stage of the trial.

Defendant points to Moreno's testimony as establishing that he had a professional relationship with defendant, and knew where defendant lived and how to contact him. Defendant points to the fact that he contacted Moreno when he was being sought by the police, and that Moreno talked to him after he was taken into custody. Defendant contends that a competent attorney could have woven this information into a compelling argument casting considerable doubt on the prosecutor's theory of the case. But Moreno's testimony provided no new

---

**38**     Defendant also presented essentially the same account in his testimony at the new trial motion hearing. Defendant does not refer to his own testimony in advancing his argument concerning the prejudicial effect of defense counsel's failure to present Tony Moreno's testimony at trial.

information beyond the fact that defendant may have occasionally acted as an informant for the police.

Defendant also points to Moreno's inability to recall his exact whereabouts for every hour on the day of the killings, contending it left open the possibility that, on the night of the killings, Moreno and defendant might have been together, a fact that could have been used by defense counsel to create reasonable doubt. It is true that on direct examination, Moreno testified he had no independent recollection of where he was every hour of that day, but the prosecutor's cross-examination of Moreno elicited his denials that he had any involvement in or knowledge of the capital crimes. Specifically, the prosecutor asked, in eliciting Moreno's denial of defendant's assertions that defendant and Moreno had planned and executed a "rip-off" of the "dope deal" — "If you'd done something like that on January 2nd, do you think you might remember that?" — to which Moreno responded affirmatively. On this record, we conclude that defendant has not shown a reasonable likelihood that the Moreno's testimony would have changed the outcome of the guilt phase.[39]

Defendant also contends that Moreno's testimony would have changed the outcome of the penalty phase because the information that defendant had been an informant for the Los Angeles Police Department would have been strong mitigating evidence. Defendant acknowledges that being a run-of-the-mill drug offender informant might have only minimal value as mitigating evidence, but asserts that he was distinguished as a valued informant, who worked for a series of high-ranking officers and detectives over a period of several years. But Moreno's

---

[39] Similarly, we also reject defendant's contention that Moreno's testimony would have changed the penalty phase outcome by introducing lingering doubt.

88

testimony at the new trial hearing did not describe defendant's undercover work in any detail. Once again, on this record, defendant fails to establish a reasonable likelihood of a different outcome had Moreno's testimony been presented for consideration at the penalty phase.

### E. Miscellaneous Challenges to the Death Penalty

Defendants raise various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims and decline to reconsider them, as follows:

California law adequately narrows the class of persons eligible for the death penalty. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.)

The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating circumstance is proved (except for § 190.3, factors (b) and (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty. (*People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731; *People v. Williams* (2010) 49 Cal.4th 405, 459.) Moreover, the jury need not be instructed as to any burden of proof in selecting the penalty to be imposed. (*People v. Burgener*, *supra*, 29 Cal.4th at p. 885.) The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) have not altered our conclusions in this regard. (*People v. Salcido* (2008) 44 Cal.4th 93, 167; *People v. Hoyos*, *supra*, 41 Cal.4th at p. 926.)

CALJIC No. 8.85 is not unconstitutionally vague. (*People v. Perry* (2006) 38 Cal.4th 302, 319.) The trial court has no obligation to modify the instruction to delete assertedly inapplicable aggravating and mitigating factors. (*Ibid.*)

"Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1165.)

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Thompson, supra,* 49 Cal.4th at p. 143.)

"International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Friend*, *supra*, 47 Cal.4th at p. 90.)

## III. DISPOSITION

For the foregoing reasons, the judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.

**DISSENTING OPINION BY WERDEGAR, J.**

I respectfully dissent. I agree with the dissenting opinion by Justice Liu that under the circumstances of this case no appellate deference is due the trial court's determination the prosecutor's peremptory challenges were exercised on nondiscriminatory grounds (dis. opn. of Liu, J., *post*, at pp. 22-25); I agree as well that an independent review of the record discloses a likelihood that as to at least two African-American women called as prospective jurors, the prosecutor engaged in purposeful discrimination in exercising his challenges, in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 (dis. opn. of Liu, J., *post*, at pp. 26-38). Unlike my colleague in dissent, however, I find it unnecessary to suggest that in general no deference is owed a trial court's credibility determination unless the court has made explicit findings upholding the prosecutor's stated reasons for exercising a challenge in light of all the circumstances bearing on the question of discrimination. (See *id.* at pp. 16-21, 25.) The egregious circumstances of the present case—the trial court's acknowledged inability to evaluate the prosecutor's primarily demeanor-based explanations due to lack of notes or recollection, the court's resulting determination that it could "only go by what [the prosecutor] is saying," and the court's supporting observation, purportedly based on its own experience, that in general "Black women are very reluctant to impose the death penalty"—amply establish that the trial court failed to make the "sincere and reasoned attempt to evaluate each stated reason" required for appellate deference under *People v. Silva*

1

(2001) 25 Cal.4th 345, 386.  What deference would be appropriate when the trial court has denied the motion without explicit findings regarding the prosecutor's explanations, but without giving positive indications it has failed to carefully scrutinize those explanations, is a question for another day.

**WERDEGAR, J.**

**DISSENTING OPINION BY LIU, J.**

The court today affirms a judgment of death that followed a trial in which the prosecutor used peremptory strikes to remove the first five black women in the jury box. Defendant, who is black, was charged with robbery and murder, and the principal defense witness was a black woman, defendant's wife. When the trial judge asked the prosecutor to state his reasons for striking the five black female jurors, the prosecutor said he believed each of them would be hesitant to impose the death penalty. The prosecutor gave vague explanations for his belief, stating that it was "just my general impression from their answers . . . in spite of what they said," "[i]t was my general impression from the way she answered questions, not what she said," and "sometimes you get a feel for a person that you just know that they can't impose it based upon the nature of the way that they say something." The trial judge accepted the prosecutor's explanations despite the fact that she had "stopped taking notes" by the time at least two of these prospective jurors were questioned and thus could "only go by what [the prosecutor] is saying." In the course of ruling on one of defendant's *Batson* claims, the trial judge said she had noticed in past cases that "black women are very reluctant to impose the death penalty; they find it very difficult no matter what it is." The prosecutor ultimately accepted a jury that included one black woman, and the jury convicted defendant of murder and returned a penalty verdict of death.

1

My colleagues conclude that the trial court did not err, " 'giv[ing] great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (Maj. opn., *ante*, at p. 21.)  But deference in these circumstances all but drains the constitutional protection against discrimination in jury selection of any meaningful application.  Here the prosecutor relied largely on vague references to the jurors' demeanor; the trial judge, who had "stopped taking notes," had no way to independently evaluate the prosecutor's explanations; and the trial judge gave no legitimate reason for finding the prosecutor or his explanations to be credible.  This record provides no basis for deferring to the trial court's acceptance of the prosecutor's explanations, for there is no indication that the trial court made a sincere and reasoned effort to evaluate "all of the circumstances that bear upon the issue" of purposeful discrimination.  (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478 (*Snyder*); see *Miller-El v. Dretke* (2005) 545 U.S. 231, 239 (*Miller-El*); *Batson v. Kentucky* (1986) 476 U.S. 79, 96 (*Batson*).)  The upshot of this erroneous application of deference is the denial of defendant's *Batson* claim despite the fact that *no court*, trial or appellate, has ever conducted a proper *Batson* analysis.

Today's decision deepens a split of authority among federal and state appellate courts on the adequacy of a *Batson* ruling where the trial court has engaged in no explicit analysis of the validity of the prosecutor's facially neutral explanation.  Some cases have held that a trial court's denial of a *Batson* challenge, by itself, constitutes an implicit finding at the third step of the *Batson* analysis that the prosecutor's explanation was credible; these cases accord deference to this implicit finding.  (See, e.g, *Edwards v. Roper* (8th Cir. 2012) 688 F.3d 449, 457; *Messiah v. Duncan* (2d Cir. 2006) 435 F.3d 186, 198; *State v. Angelo* (Kan. 2008) 197 P.3d 337, 347.)  Other cases have held that when a trial court has not provided any explicit analysis of the credibility of a prosecutor's

2

explanation, a reviewing court has no basis for deferring to the trial court's ruling at *Batson*'s third step. (See, e.g., *U.S. v. McAllister* (6th Cir. 2012) 693 F.3d 572, 581; *U.S. v. Rutledge* (7th Cir. 2011) 648 F.3d 555, 558–559; *Coombs v. Diguglielmo* (3d Cir. 2010) 616 F.3d 255, 261–265; *Green v. LaMarque* (9th Cir. 2008) 532 F.3d 1028, 1031.) Our court has aligned itself with one side of this split, but not the side that reflects the United States Supreme Court's teachings on the careful scrutiny that trial courts and reviewing courts must apply to ferret out unlawful discrimination in jury selection — a harm that "compromises the right of trial by impartial jury," perpetuates " 'group stereotypes rooted in, and reflective of, historical prejudice,' " and "undermines public confidence in adjudication." (*Miller-El*, *supra*, 545 U.S. at pp. 237–238.) Because the goal of extirpating such discrimination cannot be reconciled with deference to a trial court's *Batson* ruling when there is no indication that the trial court conducted the inquiry necessary to support that ruling, and because the totality of circumstances here gives rise to a strong inference of unlawful discrimination, I respectfully dissent.

## I.

Defendant was charged with robbing and murdering two men in South Central Los Angeles after a fraudulent drug transaction went awry. Defendant's wife, who is black, was the principal witness for the defense and attempted to shift the blame for the murders to defendant's accomplices.

The case was tried in Compton. Jury selection took place in August and September of 1991, a few months after the nationally televised police beating of Rodney King, a black man, had escalated racial tensions in Los Angeles. The trial court referred to these events during voir dire, asking prospective jurors: "Is there anyone here who feels because of the Rodney King case that it's affected you to a point where you would not be able to impartially listen to the testimony of a police officer?"

3

After the prosecutor used peremptory challenges to strike the first three black women seated on the jury panel, defendant raised an objection pursuant to *Batson* and *People v. Wheeler* (1978) 22 Cal.3d 258. While observing that "I did have some of [these three jurors] marked that I expected to be exercised on," the trial court asked the prosecutor to give reasons for these challenges. The prosecutor said each of the jurors had "demonstrated a reluctance in terms of answering direct questions which called for the requirement of the imposition of the death penalty with an affirmative answer that they would impose it. They would either say, well, I think I might be able to, or I could, but their reluctance to impose it was evident not only from the answers that they gave from the time that it took them to respond to the question, their general demeanor in answering the questions and my impression from each of them." He continued: "It was just my general impression from their answers that in spite of what they said they wouldn't have the ability to impose it when it actually came down to it. That is my reasons [*sic*] for excusing them." After briefly hearing additional arguments from both parties, the trial court simply stated: "The motion is denied."

The prosecutor used another peremptory challenge to strike the next black woman seated in the jury box, prospective juror R.P. Defendant made a second *Batson*/*Wheeler* objection, and the trial court again directed the prosecutor to explain. The prosecutor said he struck R.P. for the same reason he struck the prior three black women; he had marked R.P. very low on a scale he used to rate a juror's willingness to impose the death penalty. The trial court said it did not recall whether R.P. had displayed any such hesitation. The court went on to say that although it had made notes on certain jurors who appeared to be reluctant to impose the death penalty, "I stopped making marks after a point. I'm sorry that I did that but at this point I did forget to."

4

During a recess, the prosecutor reviewed the reporter's transcript of the voir dire of R.P. and his own notes. He read portions of the transcript to the court, highlighting an exchange in which R.P. said that she had not "pinned down" when the death penalty would serve as a deterrent and that "[w]ith some people it would and with some people it probably would not." Defense counsel questioned whether these responses indicated that R.P. would be reluctant to impose the death penalty. The prosecutor, agreeing that the answers themselves did not show R.P. to be reluctant, explained: "It was just my impression she didn't have the ability in spite of what her answers were. It had a lot more to do with not what she said but how I read what she was saying from being present in court with her and observing her demeanor and the way she answered questions. It clearly isn't from the words that are written down. It was my general impression from the way she answered questions, not what she said."

The trial court then denied the *Batson/Wheeler* motion: "And I'm going to say that there is sufficient explanation on [R.P.]. [¶] As I indicated earlier, I had made notes on some of them and that was by their demeanor and their manner of responding. I don't have anything on this one at this time, but I would accept [the prosecutor's] explanation as to his exercise of the peremptory, so I would not make a finding that there is a *Wheeler* violation."

Thereafter, when the prosecutor struck the fifth black woman seated in the jury box, prospective juror R.J., defendant made his third *Batson/Wheeler* objection. At sidebar, defense counsel argued that this strike was particularly suspicious because the prosecutor had previously accepted a jury panel that included R.J. The prosecutor explained: "I did accept her because the composition was somewhat satisfactory to me. . . . [¶] I was somewhat reluctant to kick her out of fear of making a *Wheeler* motion. . . . Additionally I was a little more concerned about offending the blacks on the jury for them thinking I was

5

making the same — doing the same thing. But I went down to my office and thought about it, and it doesn't make any sense to me to go through this entire process with a juror that I honestly don't believe because of her responses and the way she answered me during the individual voir dire, it doesn't make sense to me to try this case in front of that person when I think going in they don't have the ability to render a death verdict if that's what the case calls for. [¶] . . . [I]f that means excusing her because she was rated as being low for her inability to impose the death penalty then that's what I'm going to do. It has nothing to do with the color of her skin. I can't emphasize that enough. It has to do with her responses."

At this point, the trial court interjected: "I don't recall her responses at all." The prosecutor then explained further: "It is my impression not only from her answers to the questions but her demeanor and the fashion in which she answered them, I don't think she can impose the death penalty on any case. It doesn't matter the circumstances regardless. [¶] I don't know how to exactly express it for the record." He continued: "But sometimes you get a feel for a person that you just know that they can't impose it based upon the nature of the way that they say something."

After hearing argument from defense counsel, the trial court said: "I have to say in my other death penalty cases I have found that the black women are very reluctant to impose the death penalty; they find it very difficult no matter what it is. I have found it to be true. [¶] But as I said I cannot say anything about these. I can only go by what [the prosecutor] is saying because I stopped making notes . . . ." The court then added: "I am just making a little point. I just wanted to tell you my observation that I have seen this before and I can understand why. That's all. But I am not making my ruling based on that." When defense counsel pointed out that it would be improper to base a ruling on such a rationale, the trial court said: "Of course it is improper. I am just giving it for your information, what I

6

have observed." The court then rejected defendant's motion, stating only: "And at this point I will accept [the prosecutor's] explanation."

Immediately following this hearing at sidebar, the prosecution said to the prospective jurors in open court: "It is not a mystery at all, you now. Everybody here, everybody recognizes when we go up to the bench after I kick a female black, for example, a number of times we're up there talking about the fact that I'm doing that." He explained that he had struck these jurors because of their beliefs regarding the death penalty.

Ultimately, the prosecutor exercised 17 peremptory challenges, 13 of which were directed at women, including the five black women discussed above. After the 12 seated jurors had been selected, the prosecutor at sidebar referred again to defense counsel's *Batson*/*Wheeler* motions, stating for the record: "First of all, I would like to indicate the last number of challenges I exercised were against white jurors, to be replaced by black jurors. The reason they were exercised was, first of all, I wanted a greater mix of racial diversification on this jury. [¶] Secondly, they just happened to be a couple of black jurors I rated very high because of their answers where they indicated they had an ability to impose the death penalty in a particular case. [¶] The racial makeup is five black and seven whites. There are four male blacks and one female black." The jury found defendant guilty as charged and returned a penalty verdict of death.

## II.

Proper analysis of the trial court's rulings in this case must proceed from an understanding of applicable high court precedent, beginning with *Batson*. In *Batson*, the United States Supreme Court reaffirmed the principle, long recognized since *Strauder v. West Virginia* (1880) 100 U.S. 303, that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to

7

secure." (*Batson*, *supra*, 476 U.S. at p. 86.) Although a defendant is not entitled to a jury of any particular racial composition, and "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, [citation], the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (*Id.* at p. 89.) The high court observed that violations of this constitutional principle implicate not only the fairness of individual trials but also our system of criminal justice more broadly: "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." (*Id.* at p. 87.)

Before *Batson*, the high court in *Swain v. Alabama* (1965) 380 U.S. 202 had considered the evidentiary burden that a defendant must meet in order to prove racial discrimination in jury selection. *Swain* had been interpreted to hold that a defendant may establish a prima facie case of purposeful discrimination only by showing that in case after case the prosecution had systematically excluded black prospective jurors. (See *id.* at pp. 223–224.) Because this "crippling burden of proof" had rendered "prosecutors' peremptory challenges . . . largely immune from constitutional scrutiny" (*Batson*, 476 U.S. at pp. 92–93), the high court in *Batson* reformed the inquiry used to assess whether the prosecution had exercised a peremptory strike in a racially discriminatory manner.

*Batson* set forth a three-stage inquiry that is now familiar. First, a defendant must make out a prima facie case by pointing to facts that raise the inference that the prosecution has engaged in impermissible discrimination.

8

(*Batson*, *supra*, 476 U.S. at pp. 96–97.) In determining whether the defendant has raised such an inference, the court must consider "all relevant circumstances," including whether the prosecution has engaged in a " 'pattern' of strikes" against jurors of a particular race or has made statements during voir dire or in exercising his challenges that "may support or refute an inference" of discrimination. (*Ibid.*) Second, once the defendant has made a prima facie showing, the burden shifts to the prosecution "to come forward with a neutral explanation for challenging" these jurors. (*Id.* at p. 97.) While "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause" (*ibid.*), the prosecutor "must articulate a neutral explanation related to the particular case to be tried" and may not "rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' [Citation.]" (*Id.* at p. 98.) Finally, at step three, the court must determine whether "the defendant has established purposeful discrimination." (*Ibid.*) A *Batson* motion will be granted if "it was more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170 (*Johnson*); see *Williams v. Beard* (3d Cir. 2011) 637 F.3d 195, 215 ["At step three of the *Batson* analysis, the petitioner must show that 'it is more likely than not that the prosecutor struck at least one juror because of race.' "].)

After *Batson*, the high court in *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127 (*J.E.B.*) held that "the Equal Protection Clause forbids intentional discrimination on the basis of gender, just as it prohibits discrimination on the basis of race." (*Id.* at p. 129.) "All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination." (*Id.* at pp. 141–142.) The high court observed that because "gender and race are overlapping categories, gender can be used as a pretext for

9

racial discrimination," and thus "[f]ailing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of *Batson*." (*Id.* at p. 145; see also *id.* at p. 145, fn. 18 [noting that the "temptation to use gender as a pretext for racial discrimination may explain why the majority of the lower court decision extending *Batson* to gender involve the use of peremptory challenges to remove minority women"].)

In more recent years, the high court has refined the *Batson* inquiry to better effectuate the constitutional protection against unlawful discrimination in jury selection. Because the trial court in *Batson* had rejected the defendant's claim without even requiring the prosecution to explain its strikes, *Batson* had no occasion to examine how a court should assess whether purposeful discrimination has been proven at the third step of the analysis. (See *Batson*, *supra*, 476 U.S. at p. 98.) Since *Batson*, the high court has addressed this question in *Miller-El*, *supra*, 545 U.S. 231 and *Snyder*, *supra*, 552 U.S. 472. Those cases demonstrate the careful analysis of all relevant circumstances that trial courts and appellate courts must apply in assessing the validity of the prosecution's stated reasons for striking a juror and in ultimately determining whether the defendant has proven purposeful discrimination.

In *Miller-El*, the Supreme Court granted the federal habeas corpus petition of a Texas death row inmate where the prosecution had used peremptory challenges to remove 10 black veniremembers, leaving one black juror. (*Miller-El*, *supra*, 545 U.S. at pp. 236, 240.) The prosecution had offered race-neutral explanations for each of these challenges, the trial court had accepted those explanations, and the Texas Court of Criminal Appeals had affirmed. (*Id.* at pp. 236–237.) Because petitioner's *Batson* claim had been rejected on the merits by the Texas courts, the high court could grant relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) only if petitioner could rebut by

" 'clear and convincing evidence' " the Texas courts' presumptively correct factual finding that the prosecution had not engaged in impermissible racial discrimination. (*Miller-El*, at p. 240, quoting 28 U.S.C. § 2254(e)(1).)

Even under this deferential standard of review, the high court in *Miller-El* granted habeas relief, applying a careful and comprehensive *Batson* stage three analysis of the prosecution's peremptory challenges. The high court first observed that the sheer number of strikes the prosecution had used against black panelists provided grounds to believe that the prosecution had discriminated on the basis of race. (*Miller-El*, *supra*, 545 U.S. at pp. 240–241.) Then, in order to determine whether the facially neutral reasons given by the prosecutor were false or pretextual, the high court engaged in a detailed comparative juror analysis. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241.)

Focusing on two black jurors whom the prosecution claimed to have struck because of their statements regarding the death penalty, the high court in *Miller-El* found that the statements of the two jurors were comparable to those of a number of veniremembers whom the prosecution did not strike, including some who ultimately served on the jury and others who were accepted by the prosecution but struck by the defense. (See *Miller-El*, *supra*, 545 U.S. at pp. 244–245, 248–249.) Further, the high court rejected outright another of the prosecution's stated reasons for striking one of the two black jurors as mere "makeweight" because it was proffered only after defense counsel had called into question the prosecution's originally stated reason. (*Id.* at p. 246.) Finally, the high court highlighted a number of other facts that were suggestive of discrimination: the prosecution had "shuffled" the venire panel in a manner that would make it less likely for black

11

panelists to serve on the jury (*id.* at pp. 253–254), the prosecution had posed different voir dire questions to black and nonblack panel members (*id.* at pp. 255–263), and the county prosecutor's office had employed a policy of striking black prospective jurors for decades prior to the trial (*id.* at pp. 263–264). Upon considering all of these circumstances, *Miller-El* held: "The state court's conclusion that the prosecutors' strikes of [these two jurors] were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous." (*Id.* at p. 266.)

The Supreme Court conducted a similarly careful inquiry in *Snyder*, a capital case where the prosecution had used peremptory challenges to strike all five black prospective jurors who could have served on the jury. (*Snyder*, *supra*, 552 U.S. at p. 476.) The high court focused on the prosecution's proffered reasons for striking one of these five jurors, Mr. Brooks. (See *id.* at 478 [" '[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose,' " quoting *U.S. v. Vasquez-Lopez* (9th Cir. 1994) 22 F.3d 900, 902].) The prosecution had given two reasons for striking Mr. Brooks: first, he appeared to be nervous during voir dire, and second, he might vote to convict the defendant of a lesser crime in order " 'to go home quickly' " and attend to his obligations as a student teacher. (*Snyder*, at p. 478.) The trial court had allowed the prosecutor's challenge to Mr. Brooks without explanation. (*Ibid.*)

*Snyder* concluded that the trial court committed clear error in rejecting the defendant's *Batson* objection to the strike of Mr. Brooks. (*Snyder*, *supra*, 552 U.S. at p. 474.) As to the prosecutor's first reason for the strike, the high court acknowledged that " 'nervousness cannot be shown from a cold transcript' " and that "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." (*Id.* at p. 479.) But the high court emphasized that "[h]ere . . . the record does not show that the

12

trial judge actually made a determination concerning Mr. Brooks' demeanor." (*Ibid.*) "It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. . . . [T]he trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous." (*Ibid.*)

As to the prosecutor's second proffered reason, the high court observed that the possibility that Mr. Brooks would have been willing or able to tailor the jury's verdict in order to shorten the duration of trial was "highly speculative" and that the same concerns could have been raised with respect to jurors accepted by the prosecution who had "disclosed conflicting obligations that appear to have been at least as serious" as those of Mr. Brooks. (*Snyder*, *supra*, 552 U.S. at pp. 482– 483.) The high court concluded that the "prosecution's proffer of this pretextual explanation naturally [gave] rise to an inference of discriminatory intent." (*Id.* at p. 485.) Because the trial court had made no finding on the record as to the prosecution's demeanor-based reason, and because there was no indication that the prosecution would have challenged Mr. Brooks "based on his nervousness alone" or that this "subtle question of causation could be profitably explored further on remand . . . more than a decade after petitioner's trial," the high court reversed the conviction. (*Id.* at pp. 485–486.)

In *Thaler v. Haynes* (2010) 559 U.S. 43 [130 S.Ct. 1171] (*Haynes*), the high court issued a brief per curiam opinion clarifying that *Snyder* did not hold that a trial court must invariably reject a proffered demeanor-based reason if the trial court had not personally observed the aspect of juror demeanor identified by the prosecution. (*Id.* at p. ___ [130 S.Ct. at p. 1174].) In *Haynes*, the Fifth Circuit

13

had relied on *Snyder* in granting a state prisoner's federal habeas corpus petition on the ground that the trial judge who had accepted some of the prosecution's demeanor-based reasons for exercising peremptory challenges was not the same trial judge who had presided during voir dire. (*Id.* at p. ___ [130 S.Ct. at pp. 1172–1173].) The precise question in *Haynes* was whether the Fifth Circuit had correctly applied AEDPA's requirement that such a habeas corpus petition may be granted only if the state court's decision " 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' " (*Haynes*, at p. ___ [130 S.Ct. at p. 1173], quoting 28 U.S.C. § 2254(d)(1).) As the high court has made clear, AEDPA's deferential standard turns not on the actual merits of a constitutional claim but rather on what the high court itself has explicitly said regarding the constitutional claim. (See *Haynes*, at p. ___ [130 S.Ct. at p. 1173]; see also *Marshall v. Rodgers* (Apr. 1, 2013, No. 12-382) ___ U.S. ___ , ___ [2013 U.S. LEXIS 2546 at pp. *10–*11]; *Harrington v. Richter* (2011) ___ U.S. ___, ___ [131 S.Ct. 770, 786].) *Haynes* reversed the Fifth Circuit's decision because "no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied." (*Haynes*, at p. ___ [130 S.Ct. at p. 1175].) While noting that "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor," *Haynes* remanded for further consideration of whether the state court's rejection of the petitioner's *Batson* claim was nevertheless unreasonable. (*Ibid.*)

To sum up this review of applicable precedent, the three-step inquiry set forth in *Batson* eased the "crippling burden of proof" that *Swain* had been understood to impose on defendants challenging racially discriminatory strikes. (*Batson*, *supra*, 476 U.S. at p. 92.) *J.E.B.* extended *Batson* to discrimination in jury selection on the basis of gender. (*J.E.B.*, *supra*, 511 U.S. at pp. 141–142.) *Miller-El* made clear the thorough and careful scrutiny of all relevant

14

circumstances that trial and appellate courts must apply at the third step of the *Batson* analysis in light of the "practical difficulty of ferreting out discrimination in selections discretionary by nature." (*Miller-El*, *supra*, 545 U.S. at p. 238.) *Snyder* applied this careful scrutiny to invalidate a *Batson* ruling where the trial court had made no explicit determination as to the validity of the prosecutor's demeanor-based explanation and where consideration of all relevant circumstances showed that another explanation offered by the prosecution was "highly speculative" and "pretextual." (*Snyder*, *supra*, 552 U.S. at pp. 482, 485.) Although *Snyder* did not establish any "categorical rule" (*Haynes*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1175]), it is instructive to observe the detailed and expansive analysis at *Batson*'s third step that the high court undertook in *Snyder*, as in *Miller-El*, "even under [a] highly deferential standard of review." (*Snyder*, at p. 479; see *Miller-El*, *supra*, 545 U.S. at p. 240 [applying AEDPA].) The development of this line of doctrine over the past three decades evinces the high court's "unceasing efforts to eradicate [unlawful] discrimination in the procedures used to select the venire from which individual jurors are drawn." (*Batson*, at p. 85.)

## III.

It remains the case that appellate courts reviewing *Batson* claims "ordinarily" should accord "great deference" to a trial court's findings of fact, including any finding as to the ultimate question of whether a strike was racially motivated. (*Batson*, *supra*, 476 U.S. at p. 98, fn. 21; see *Snyder*, *supra*, 552 U.S. at p. 477; *Hernandez v. New York* (1991) 500 U.S. 352, 365 (plur. opn.).) It makes good sense that appellate courts should generally defer to such findings; a trial court, unlike an appellate court, is in a position to evaluate the non-verbal demeanor of the jurors who are struck and to assess the credibility of the prosecutor as he or she explains the strikes. (See *Snyder*, at p. 477

["determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province" ' "].)

There is a split of authority, however, as to how the deference ordinarily accorded to a trial court's *Batson* ruling should be reconciled with the obligation of trial courts "to assess the plausibility of [the prosecution's proffered] reason in light of all evidence with a bearing on it." (*Miller-El*, *supra*, 545 U.S. at p. 252.) This issue has arisen in a number of cases where the trial court, after hearing the prosecutor's facially neutral explanation for a strike, gave little or no explanation on the record in support of its denial of a *Batson* challenge. The present case implicates this very issue: the trial court did not make any explicit findings regarding the prosecution's proffered reasons for striking five black women jurors, nor did it provide any explicit analysis of all relevant circumstances bearing on defendant's *Batson* motions. Instead, as to each of the three *Batson* motions, the trial court either summarily stated that "[t]he motion is denied" or simply asserted that it would "accept" the prosecution's explanation for the strike. The closest the trial court came to making a specific finding regarding any of the strikes was when it observed that although it could not say "anything" about whether the black women struck were reluctant to impose the death penalty, it had observed in prior cases that "black women are very reluctant to impose the death penalty" — which of course is not a proper basis for crediting the prosecutor's explanations for the strikes.

My colleagues nevertheless accord the trial court's *Batson* rulings "their usual deference." (Maj. opn., *ante*, at p. 25.) Instead of conducting a de novo review of the record to determine "whether it was more likely than not that the challenge was improperly motivated" (*Johnson*, *supra*, 545 U.S. at p. 170), today's opinion applies a form of substantial evidence review. The court presumes that the trial court credited those aspects of the prosecutor's explanations

16

that cannot be fully evaluated on a cold record (see maj. opn., *ante*, at pp. 31–33) and affirms the trial court's rulings on the grounds that the prosecutor's stated reasons were not " 'inherently implausible' " and that there is some evidence in the record that "supports" those reasons (*id.* at p. 26; see also *id.* at pp. 27–40.) As explained below, the court errs and, in so doing, deepens the split of authority regarding the deference owed to a trial court that fails to explicitly engage in the analysis required at *Batson*'s third step.

## A.

On one side of the split, a number of courts have held that where, as here, the trial court does not demonstrate on the record that it has evaluated the prosecutor's explanation in light of all the circumstances bearing on the issue of purposeful discrimination, the trial court's denial of a *Batson* challenge is not entitled to deference.

In *U.S. v. Rutledge*, *supra*, 648 F.3d 555 (*Rutledge*), the prosecutor struck two black jurors and, as to the first juror, explained that he was worried the juror would be biased due to the juror's stated concern during voir dire that other jurors would not listen to him because he shared the race of the defendant. (*Id.* at p. 558.) As to the second juror, the prosecutor explained that she appeared agitated and frustrated during voir dire. (*Id.* at p. 557.) After hearing argument, the district court simply said: " 'I think that does it then. Those are both nonracial-related reasons.' " (*Id.* at p. 558.) The court then permitted the two jurors to be excused. (*Ibid.*) The Seventh Circuit refused to accord any deference to the district court's denial of defendant's *Batson* challenge. Observing that the district court had not made any explicit findings with respect to the credibility of the prosecution's proffered race-neutral reasons, the court of appeals concluded that "if there is nothing in the record reflecting the trial court's decision, then there is nothing to which we can defer." (*Id.* at p. 559.) The appropriate remedy, the court

17

determined, was to remand the case to allow the district court to fill the "void" created by its failure to make explicit findings. (*Id.* at p. 557.)

In *U.S. v. McAllister*, *supra*, 693 F.3d 572, the Sixth Circuit reached a similar conclusion. At *Batson*'s second step, the prosecutor claimed to have struck the challenged juror because the juror was unemployed and because his prior service in the military police might lead him to be sympathetic to the defendant, a former FBI agent. (*Id.* at p. 577.) In response to this explanation, the district court simply said: " 'All right.' " (*Ibid.*) The Sixth Circuit observed that "[f]rom a review of the record, it is unclear to what extent the district court engaged in the third step [of the *Batson* analysis], if it did at all." (*Id.* at p. 580.) "The district court did not consult with the defense counsel to hear a response to the Government's race-neutral explanation, nor did it engage the prosecution to independently assess the plausibility of its argument. [(*Miller-El*, *supra*, 545 U.S. at pp. 251–252.)] Gauging from the district court's two-word analysis and finding — 'all right' — it is doubtful that the district court consulted all circumstances that bear upon the issue of racial animosity. [(*Snyder*, *supra*, 552 U.S. at p. 478.)] We have no way of reviewing the district court's reasoning for rejecting McAllister's *Batson* challenge." (*McAllister*, at p. 582.) The Sixth Circuit remanded for the district court to make "explicit on-the-record findings as to whether McAllister established the existence of purposeful race discrimination in the selection of his jury." (*Ibid.*)

The Third Circuit confronted a similar situation in *Coombs v. Diguglielmo*, *supra*, 616 F.3d 255 (*Coombs*). The prosecutor in *Coombs*, upon striking two black female jurors from the panel, explained that he struck one because she was an eyewitness to a shooting and because her mother had been robbed, and that he struck the other because her brother had been charged with robbery. (*Id.* at p. 258.) The state trial court denied the defendant's *Batson* motions, stating: "

18

'These are what lawyers do with peremptory challenges. They're not race-based. . . . As long as we have peremptory challenges, lawyers are going to make judgments maybe based on hunches, maybe based on prior experiences, maybe based on feelings, but they're not based on race. Both of you are much too good lawyers to do something like that.' " (*Ibid.*) The defense made another *Batson* motion after the prosecutor struck three additional black jurors. The prosecutor explained that one juror's cousin had been a witness to a robbery and that another juror had a nephew who had been shot, a nephew in jail, and a friend who was a defense attorney. (*Ibid.*) As to the final juror, the prosecutor said that he " 'just didn't like him' " because of the " 'way he was looking at me' " and added that the juror had failed to " 'check off many boxes' " on the jury questionnaire. (*Ibid.*) In response to these explanations, the trial court said, " 'Let's go.' " (*Ibid.*) Defense counsel then asked " 'Your Honor is going to accept the Commonwealth's assertions and deny my motion?' " (*Ibid.*) The trial court responded: " 'Yes.' " (*Ibid.*)

The Third Circuit held that the trial court "failed to conduct a full and complete *Batson* step three analysis." (*Coombs*, *supra*, 616 F.3d at p. 263.) It observed that the trial court had improperly limited defense counsel's opportunity to respond to the prosecution's proffered reasons. (*Id.* at pp. 263, 265.) Furthermore, the trial court had not made "the findings required under *Batson*." (*Id.* at p. 263.) Rather, "[r]elying upon its view of counsel's competence and/or professionalism, the court failed to inquire into whether the prosecutor's purported reasons for striking the jurors were pretextual." (*Ibid.*) This failure to inquire into the validity of the prosecutor's reasons was particularly troubling given the prosecutor's vague explanation for striking the fifth juror. (*Id.* at pp. 263–264.) Accordingly, the Third Circuit remanded for an evidentiary hearing that would

19

permit the district court to conduct the analysis that the state trial court had apparently failed to conduct in the first instance.  (*Id.* at p. 265.)

In *Green v. LaMarque*, *supra*, 532 F.3d 1028, the prosecutor struck six black prospective jurors and offered race-neutral reasons for each strike.  The state trial court denied the defendant's *Batson* motion without providing any analysis on the record as to whether the prosecution's proffered reasons were pretextual.  (*Id.* at p. 1030.)  The Ninth Circuit concluded that the trial court had "failed to undertake ' "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," ' including a comparative analysis of similarly situated jurors."  (*Ibid.*)  The court of appeals rejected the state's argument that it should "presume the trial court found the prosecution's race-neutral reasons for striking [one of these jurors] to be genuine when it denied" the defendant's *Batson* motion, instead holding that "we must not make such a presumption where 'the court never fulfilled its affirmative duty to determine if the defendant had established purposeful discrimination.' "  (*Id.* at p. 1031.)  Accordingly, the Ninth Circuit "conduct[ed] that analysis *de novo*."  (*Ibid.*; see also *McGahee v. Alabama Department of Corrections* (11th Cir. 2009) 560 F.3d 1252, 1260 [state trial court unreasonably applied clearly established federal law in failing to make a ruling on the credibility of the prosecution's proffered race-neutral reasons].)

Each of the decisions above declined to accord deference to the trial court's denial of a *Batson* claim because the trial court did not demonstrate on the record that it had engaged in the comprehensive inquiry required to make such a ruling at *Batson*'s third step.  A number of state high courts have also followed this approach.  (See, e.g., *Jones v. State* (Del. 2007) 938 A.2d 626, 633–636; *People v. Davis* (Ill. 2008) 899 N.E.2d 238, 249–250; *Commonwealth v. Rodriguez* (Mass. 2010) 931 N.E.2d 20, 33; *State v. Pona* (R.I. 2007) 926 A.2d 592, 608 ["If this Court is to ensure that a trial justice has properly considered the credibility of each

proffered race-neutral reason and has addressed each of a defendant's arguments that a peremptory strike actually was a pretext for purposeful discrimination, we must be presented with an adequate record to review on appeal."].)

Other courts, however, have taken a different approach. In *Edwards v. Roper*, *supra*, 688 F.3d 449, the prosecutor claimed that he struck one juror because he was a postal worker and might see jury service as an opportunity to " 'not follow the rules.' " (*Id.* at p. 456.) In rejecting the defendant's *Batson* challenge, the trial court said only: " 'The *Batson* challenge will be denied . . . .' " (*Id.* at p. 457.) Before the Eighth Circuit, the petitioner argued that the Missouri Supreme Court had erred in concluding that the trial court had made a factual finding regarding the ultimate question of the prosecutor's discriminatory intent. (*Ibid.*) The Eighth Circuit rejected this argument. Relying on circuit precedent, the court said: "The denial of a *Batson* challenge . . . 'is itself a finding at [*Batson*'s] third step that the defendant failed to carry his burden of establishing that the strike was motivated by purposeful discrimination,' [(*Smulls v. Roper* (8th Cir. 2008) 535 F.3d 853, 863)], and it 'includes an implicit finding that the prosecutor's explanation was credible.' [(*Taylor v. Roper* (8th Cir. 2009) 577 F.3d 848, 856)]." (*Ibid.*)

Similarly, the Second Circuit has held that the "unambiguous rejection of a *Batson* challenge will demonstrate with sufficient clarity that a trial court deems the movant to have failed to carry his burden to show that the prosecutor's proffered race-neutral reason is pretextual." (*Messiah v. Duncan*, *supra*, 435 F.3d 186, 198.) In *Messiah*, the prosecutor said he struck a black juror because the juror had a background in social work and because the juror's wife was a lawyer. (*Id.* at p. 190.) The trial court, after hearing argument, said only: " 'That's five, five by the People' " — a reference to the number of jurors the prosecutor had struck, including the juror who was the subject of the defendant's *Batson* motion,

21

and an implicit ruling that the strike would be allowed. (*Id.* at p. 199) The Second Circuit held that this statement made it "evident that the trial judge did not discredit or find unpersuasive the prosecution's race-neutral explanations" and thus constituted "a succinct but adequate *Batson* ruling" entitled to " 'great deference.' " (*Id.* at pp. 199, 200.) *Messiah* postdates *Miller-El* and continues to be followed after *Snyder*. (See, e.g., *Meikle v. Dzurenda* (D.Conn. Jan. 17, 2009, No. 3:05-CV-742) 2009 U.S. Dist. Lexis 11883, at pp. *10–*12; *Perez v. Smith* (E.D.N.Y. 2011) 791 F.Supp.2d 291, 308–310; cf. *Dolphy v. Mantello* (2d Cir. 2009) 552 F.3d 236, 239 [adhering to *Messiah* but declining to defer to the trial court's *Batson* ruling where the trial court "seemed to assume that a race-neutral explanation (*Batson* step two) was decisive and sufficient" (italics added)].)

*State v. Angelo*, *supra*, 197 P.3d 337, which postdates *Snyder*, provides another example of this approach. In *Angelo*, the prosecutor struck three black jurors because, as the prosecutor subsequently explained, one had previously served on a hung jury, another was familiar with the scene of the crime and had a brother who had been arrested for drug distribution, and the third had an " 'unfavorable disposition' " and had frowned when the prosecution mentioned " 'certain aspects of the case.' " (*Id.* at p. 347.) The trial court observed that it had " 'not detected a pattern of racial[ly motivated] strikes' " and then rejected the defendant's *Batson* motion. (*Id.* at pp. 346–347.) With respect to the first two jurors, the trial court said only: " 'And so far [the prosecutor] has stated race neutral reasons for striking juror number 8 and 31.' " (*Id.* at p. 347.) With respect to the third juror, the trial court said: " 'The Court is going to find that again that [the prosecutor] has stated a race neutral reason for striking that particular juror . . . .' " (*Ibid.*) Later, the trial court told defense counsel that the " '*Batson* challenge [was] noted for the record' " and was " 'overruled.' " (*Ibid.*) On appeal, the defendant argued that the trial court had failed to perform the analysis

required at *Batson*'s third step. The Kansas Supreme Court "acknowledge[d] the record does not reflect a clearly articulated identification of the third step." (*Ibid.*) But, emphasizing that the trial court had heard the prosecution's proffered reasons and the defense's responses, the high court concluded that "the trial court considered this information and impliedly held [the defendant] failed to prove that the State's reasons were pretextual and that he therefore failed in his ultimate burden to prove purposeful discrimination." (*Id.* at p. 348.)

These latter decisions, among others, take the view that even when a trial court does not make explicit its reasons for rejecting a defendant's *Batson* claim, a reviewing court may presume that the trial court engaged in a *Batson* step three analysis sufficient to determine whether the prosecution had actually discriminated on the basis of race, and thus the trial court's denial of the claim should be accorded deference. (See also *Stevens v. Epps* (5th Cir. 2010) 618 F.3d 489, 499 [holding Mississippi Supreme Court did not unreasonably apply clearly established federal law in concluding that trial court had implicitly credited prosecution's stated reason when rejecting *Batson* challenge]; *State v. Sparks* (La. 2011) 68 So.3d 435, 474–475; *People v. Robinson* (Colo.Ct.App. 2008) 187 P.3d 1166, 1173–1174.)

## B.

This court has aligned itself with the latter approach. Although we have said that deference to a trial court's *Batson* ruling is appropriate only when the trial court "makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered" (*People v. Burgener* (2003) 29 Cal.4th 833, 864), our cases clearly hold that a trial court need not "make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge" so long as the reasons are not inherently implausible and are supported by the record. (*People v.*

23

*Reynoso* (2003) 31 Cal.4th 903, 929; see *People v. Silva* (2001) 25 Cal.4th 345, 385–386.)  Applying this approach, which predates *Miller-El*, today's opinion accords the trial court's *Batson* rulings "their usual deference" (maj. opn., *ante*, at p. 25) and affirms those rulings upon combing the record for evidence that might support the prosecutor's explanations for the strikes (*id.* at pp. 27–40).  The court does this even though the trial judge made no explicit findings and engaged in no explicit analysis regarding the validity of the prosecutor's proffered reasons, and even though the trial judge acknowledged her inability to make such findings as to at least two and most likely three of the five black women whom the prosecutor struck.  As explained below, the court errs.  Deference is unwarranted because here, as in cases like *Rutledge* and *Coombs* (see *ante*, at pp. 16–18), a reviewing court cannot conclude on this record that the trial court actually performed the thorough inquiry at *Batson*'s third step required by *Snyder* and *Miller-El*.

When a prosecutor relies on a juror's demeanor to justify a peremptory strike, the trial court, having observed the proceedings, is ordinarily in a better position than an appellate court to determine whether the prosecutor's reason is valid.  Here, however, the trial court made clear that it did not recall the demeanor of prospective jurors R.P. or R.J.  The trial judge stated on the record that she had "stopped making marks after a point" during voir dire and thus "couldn't say anything" about either R.P.'s or R.J.'s demeanor.  In addition, the trial court's comments suggest that it was unable to make any findings regarding the demeanor of prospective juror P.C., one of the first three black women struck.  When the defense made its *Batson*/*Wheeler* motion after the first three black women were struck, the trial court observed that it had notes on "some" of them.  P.C.'s voir dire had taken place after the voir dire of R.P. — in other words, after the "point" at which the trial court had "stopped making marks."  In all likelihood, the reason the trial court said it had marks on "some" but not all of the first three black

24

women jurors struck was that it had no notes on P.C. Even if a trial court does not necessarily err any time it cannot or does not make an independent finding regarding a juror's demeanor after the prosecutor proffers a demeanor-based explanation (see *Haynes*, *supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1173]), it is beyond cavil that absent such a finding, there is no basis in the record for a reviewing court to accord deference to the trial court's customary advantage in evaluating the juror's demeanor. (See *Snyder*, *supra*, 552 U.S. at p. 479.)

Nor is there any basis for concluding that the trial court in this case carefully examined other relevant considerations in assessing the validity of the prosecutor's proffered explanations. Only with prospective juror R.P. did the trial court ever consult the transcript of the voir dire proceedings to determine if there was support for the prosecutor's claim that the stricken jurors had expressed reluctance to impose the death penalty. And consulting the transcript resulted in the prosecutor admitting that his perception of R.P.'s reluctance "clearly" wasn't supported by "the words that are written down." Because the trial court said it had taken notes on "some" of the first three black women struck, it presumably had some basis to assess the validity of the prosecutor's explanation without consulting the voir dire transcript. But the trial court had no such notes on R.J. and, in all likelihood, no such notes on P.C. With regard to P.C., it is a fair inference that the trial court did not recall her demeanor or her responses; with regard to R.J., the trial court explicitly said "I don't recall her responses at all." In this respect, the trial court was in a worse position than this court to evaluate the prosecutor's stated reasons, for we have before us the record of voir dire and can evaluate whether the prospective jurors said what the prosecutor claimed they said.

The sole advantage the trial court had in this case was the opportunity to observe the prosecutor's demeanor. The prosecutor's demeanor in explaining a strike is certainly a relevant factor at *Batson*'s third step. (See *Haynes*, *supra*, 559

U.S. at p. ___ [130 S.Ct. at p. 1175]; *Snyder*, *supra*, 522 U.S. at p. 477.) But the trial court here did not make any explicit finding regarding the prosecutor's demeanor, and there is no reason to think the trial judge accepted the prosecutor's explanations because she implicitly found his demeanor to be credible rather than because his explanations for striking the black women jurors fit her own preconceptions about the ability of black women to impose the death penalty. (See *post*, at pp. 24–25.) Moreover, even if the trial court had made a finding as to the prosecutor's demeanor, it is questionable how much weight such a finding would have at the third step of the *Batson* analysis under the circumstances in this case. A trial judge's statement to the effect that "I am unable to independently evaluate the prosecutor's explanation, so I can only go by what the prosecutor is saying *but he looks honest to me*" provides little reason for a reviewing court to defer to the trial court's *Batson* ruling. The important fact remains that the trial court did not provide any indication that it actually conducted the thorough and careful inquiry required at *Batson*'s third step to determine whether the prosecutor's strikes were impermissibly discriminatory. (See *Rutledge*, *supra*, 648 F.3d at p. 559 ["if there is nothing in the record reflecting the trial court's decision, then there is nothing to which we can defer"].)

Finally, if any additional reason were needed for why a reviewing court cannot defer to the trial court's *Batson* rulings in this case, it is the following: While stating that she could not "say anything" regarding some of the black female jurors struck by the prosecution, the trial judge observed that in her experience "black women are very reluctant to impose the death penalty." This is precisely the sort of reliance on racial and gender stereotypes that *Batson* is intended to eliminate. Prospective minority jurors may not be excluded from jury service based upon "assumptions [ ] which arise solely from the jurors' race" or gender. (*Batson*, *supra*, 476 U.S. at p. 98; see *J.E.B.*, *supra*, 511 U.S. at pp. 141–

26

142.) The fact that the trial judge engaged in such race- and gender-based speculation in the course of ruling on the validity of the prosecutor's strike — speculation that the judge went on to justify by saying "I have seen this before and I can understand why" — leads to the obvious concern that the trial judge accepted the prosecutor's explanations precisely because she believed "black women are very reluctant to impose the death penalty." Although the trial judge subsequently backpedaled and said "I am not making my ruling based on that," it is, to put it bluntly, pretty hard to unring that bell. Why would the trial judge have offered this observation in the first place unless she thought it was relevant to whether the prosecutor had properly removed five black women from the venire? For this reason as well as the others discussed above, the trial court's *Batson* rulings are not entitled to deference on appeal.

In sum, when a trial court fails to make explicit findings or to provide any on-the-record analysis of the prosecution's stated reasons for a strike, a reviewing court has no assurance that the trial court has properly examined "all of the circumstances that bear upon the issue" of purposeful discrimination. (*Snyder*, *supra*, 552 U.S. at p. 478.) When a trial court has not made clear that it conducted the analysis necessary to determine whether a strike was motivated by race or gender, an appellate court should not treat its ruling as though it had. The problem with doing so is illustrated by this case: Because the trial court does not appear to have conducted a proper *Batson* step three inquiry, and because this court has limited its review to a deferential search of the record for any evidence that might support the trial court's *Batson* rulings, *no court* — trial or appellate — has yet performed the careful analysis required by *Snyder* and *Miller-El* to determine whether it was more likely than not that the prosecutor's strikes of five black female jurors were discriminatory. A proper analysis at *Batson*'s third step reveals strong evidence of purposeful discrimination, as I now explain.

27

## IV.

In conducting this analysis, I focus on R.P. and R.J., two jurors for whom the trial court had no notes and thus no basis for independently evaluating the prosecutor's explanations. Upon reviewing the record, I conclude that it was more likely than not that the prosecutor's challenges of R.P. and R.J. were based upon impermissible discrimination. This conclusion follows from the prosecutor's pattern of strikes against black women, the vagueness of the prosecutor's explanations for striking these jurors, and other facts in the record that support an inference of discrimination.

## A.

The trial judge properly found that the prosecutor's pattern of strikes against black female jurors raised an inference of racial discrimination, and the fact that the prosecutor ended up striking five of the six black women seated in the jury box is of course relevant to the ultimate question of whether one or more strikes were in fact motivated by discrimination. (See *Miller-El*, *supra*, 545 U.S. at p. 241 [" 'Happenstance is unlikely to produce this disparity.' "].)

The court emphasizes that the jury ultimately included one black woman. (Maj. opn., *ante*, at pp. 40–41.) But the fact that the prosecution allowed a single black woman to remain on the jury does little to negate the inference that the prosecutor's prior strikes were discriminatory. As the prosecutor explained after having struck the fifth black woman in the venire (R.J.), he was worried about "making a *Wheeler* motion" and "offending the blacks on the jury." The prosecutor's failure to strike a *sixth* black female juror is therefore hardly surprising and not especially probative of his motivations in striking the prior five. As the high court observed when considering a comparable situation in *Miller-El*: "This late-stage decision to accept a black panel member . . . does not . . . neutralize the early-stage decision to challenge a comparable venireman . . . . In

28

fact, if the prosecutors were going to accept any black juror to obscure the otherwise consistent pattern of opposition to seating one, the time to do so was getting late." (*Miller-El*, *supra*, 545 U.S. at p. 250.)

Other relevant circumstances support an inference of discrimination. The racial overtones of this trial, in which a black man was charged with capital murder, were apparent to all those present in the courtroom. For example, the trial judge mentioned the Rodney King case and asked prospective jurors whether it would affect their ability to impartially listen to testimony by a police officer. The prosecutor, speaking to the entire venire after striking the fifth black woman, said it was not a "mystery" that every time he struck "a female black" the trial court held a hearing, and he insisted the strikes were not racially motivated. Notwithstanding his protestations of good faith, it is clear that the prosecutor was quite cognizant of the race of the jurors he struck, and he was also aware that the principal defense witness was going to be a black woman.

Moreover, the prosecutor explicitly acknowledged that race had played a role in his exercise of peremptory challenges. At the close of jury selection, the prosecutor indicated for the record that he had used his last peremptory challenges to strike "white jurors" and that he had done so in part because he "wanted a greater mix of racial diversification on [the] jury." My colleagues say these comments "do not appear to . . . show that [the prosecutor] discriminated against African-American women jurors." (Maj. opn., *ante*, at p. 40.) But the fact that the prosecutor consciously selected some jurors on the basis of race reasonably supports an inference that his strikes of the five black female jurors were informed by similar considerations.

### B.

The reasons given by the prosecutor to explain his strikes warrant particularly close scrutiny and provide good cause to doubt their validity. The fact

29

that the prosecutor apparently believed that every single one of the first five black women in the jury box should be struck for *precisely the same reason* is itself cause for suspicion. This suspicion is heightened by the vagueness and generality of the prosecutor's stated explanations. He described his concerns regarding each of these five prospective jurors in almost exactly the same way, saying that their responses and demeanor had led him to believe they would be reluctant to impose the death penalty. Only once, when he invoked R.P.'s statements regarding the deterrent value of the death penalty, did he attempt to refer specifically to a response that any of these jurors had given in their questionnaires or during voir dire — and in that case, as noted, the prosecutor ended up admitting that R.P.'s statements did not support his belief that she would be reluctant to impose the death penalty.

The prosecutor's vague references to the jurors' demeanor are especially suspect. With respect to the first three challenged jurors, he said "their reluctance to impose it was evident not only from the answers that they gave but from the time that it took them to respond to the question, their general demeanor in answering the questions and my impression from each of them." He added that it was his "general impression from their answers that in spite of what they said they wouldn't have the ability to impose it." With respect to R.P., the prosecutor said: "It was my general impression from the way she answered questions, not what she said." And with respect to R.J., the prosecutor said: "It is my impression not only from her answers to the questions but her demeanor and the fashion in which she answered them . . . . I don't know how to exactly express it for the record. . . . But sometimes you get a feel for a person." The prosecutor did not point to a single specific aspect of R.P's or R.J.'s demeanor that supported his belief. The prosecutor did not say, for example, that either juror had paused before answering

30

a particular question, had failed to make eye contact, or had appeared nervous or upset.

An attorney may rely on a juror's demeanor in justifying a peremptory strike, but demeanor-based reasons warrant careful scrutiny. "Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales." (*Davis v. Fisk Electric Co.* (Tex. 2008) 268 S.W.3d 508, 518; see *Smith v. U.S.* (D.C. 2009) 966 A.2d 367, 383; *Commonwealth v. Maldonado* (Mass. 2003) 788 N.E.2d 968, 973; *State v. McFadden* (Mo. 2007) 216 S.W.3d 673, 676 fn. 17; Raphael & Ungarvsky (1993) *Excuses, Excuses: Neutral Explanations under* Batson v. Kentucky, 27 U. Mich. J.L. Reform 229, 246 [studying all published cases applying *Batson* in the first five years after that decision and concluding: "A juror's demeanor is an extremely frequent neutral explanation in our study. It is also the most subjective type of explanation and thus, the easiest and most likely pretext for striking black jurors."].) Careful scrutiny is especially appropriate where, as here, the prosecutor's descriptions of the jurors' purported demeanor are entirely non-specific. (See *Brown v. Kelly* (2d Cir. 1992) 973 F.2d 116, 121.)

In this respect, the prosecutor's explanation for striking R.P. is particularly questionable. The prosecutor, after reviewing R.P.'s voir dire transcript, disclaimed any reliance on R.P.'s responses and then rested his explanation on the following general assertion regarding R.P.'s demeanor: "It was my general impression from the way she answered questions, not what she said." This proffered reason is the sort of vague and conclusory explanation for a peremptory challenge that is particularly susceptible to masking improper discrimination. If the prosecutor had some valid basis for this strike, one would expect him to have been able to articulate it. "It is true that peremptories are often the subjects of

31

instinct, [citation], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." (*Miller-El*, *supra*, 545 U.S. at p. 252.) " 'Clearly the most vulnerable reasons are those based on hunches and intuitions.' " (*Caldwell v. Maloney* (1st Cir. 1998) 159 F.3d 639, 651; see also *U.S. v. Bentley-Smith* (5th Cir. 1993) 2 F.3d 1368, 1375 ["An attorney who claims that he or she struck a potential juror because of intuition alone, without articulating a specific factual basis such as occupation[,] family background, or even eye contact or attentiveness, is more vulnerable to the inference that the reason proffered is a proxy for race."].)

## C.

There is ample reason to believe that this "vulnerable" explanation for the strike of R.P., along with those given for the prosecutor's strike of R.J., in fact masked an improper discriminatory purpose. Examination of these jurors' responses in their questionnaires and during voir dire demonstrates that the prosecutor lacked any firm basis for believing they would have been reluctant to impose the death penalty, which further strengthens the inference of purposeful discrimination in this case.

Today's opinion examines the record and reaches the opposite conclusion. (Maj. opn., *ante*, at p. 27 ["We conclude that the record supports the prosecutor's stated reasons for exercising the peremptory challenges."].) But the court does not perform the careful analysis required by and demonstrated in *Snyder* and *Miller-El*. Instead of thoroughly examining the record to determine whether it was more likely than not that the prosecutor struck one or more of the five black female jurors based on purposeful discrimination, the court merely scours the record for statements by the struck jurors that might support the prosecutor's explanations (even though the prosecutor did not specifically rely on any of the statements that

32

the court cites) and dismisses in a footnote the comparable statements made by other jurors.  (See maj. opn., *ante*, at pp. 27–37, 38–40 & fn. 22.)

The court's analysis reflects the erroneously deferential standard that it applies in reviewing the trial court's *Batson* rulings.  (See *ante*, at pp. 15, 22.)  It also appears to reflect the court's understanding of the "inherent limitations" of comparative juror analysis.  (Maj. opn., *ante*, at p. 38.)  To be sure, " '[a] transcript will show that the panelists have similar answers: it cannot convey the different ways in which those answers were given.' "  (*Ibid.*)  But here the cold transcript is what we must examine because the trial court did not make any findings regarding the " 'different ways in which . . . answers were given' " by R.P. or R.J.  Although "retrospective comparisons of jurors based on a cold appellate record may be very misleading" when the "alleged similarities" between the struck jurors and seated jurors were not explored in the trial court (*Snyder*, *supra*, 552 U.S. at p. 483), that is not the case here.  The reason given by the prosecutor for striking R.P. and R.J. had to do with a personal characteristic — an individual's ability to impose the death penalty — that had been the central focus of the lengthy jury selection process conducted to that point.  Because the "shared characteristic . . . was thoroughly explored by the trial court" and by the parties, it provides a relatively strong basis for concluding that jurors who appeared to be similar were in fact "comparable."  (*Ibid.*)  As detailed below, comparative juror analysis casts significant doubt on the prosecutor's stated reasons for striking R.P. and R.J.

**1.**

As the court acknowledges, R.P.'s questionnaire "generally indicated a willingness to impose the death penalty."  (Maj. opn., *ante*, at p. 30.)  She wrote that the death penalty is "sometimes necessary," that it is not imposed too often in this state, and that California should have the death penalty because "more people would think before committing a serious crime."  She believed that the death

33

penalty's purpose is to be "a deterrent to crime." She also indicated that crime was a "very serious" problem and that she would like to be a juror in this capital case.

Contrary to the court's contention, R.P.'s voir dire answers did not suggest that she was any less willing to impose the death penalty than her questionnaire responses showed her to be. R.P. said she would be able to follow the law and could impose the death penalty. When asked whether she could vote to put defendant himself to death, she answered: "I feel I could."

In its search for any hint of reluctance, the court focuses entirely on an exchange with the prosecutor in which R.P said the death penalty would serve as a deterrent to *some* people when imposed in *some* cases. (Maj. opn., *ante*, at pp. 30–31.) As R.P. put it during voir dire: "Sometimes it would and sometimes it would not. With some people it would and with some people it would not." Instead of demonstrating R.P.'s reluctance to impose the death penalty, these comments simply show that R.P. understood the concept of deterrence. Few if any people would seriously contend that imposing the death penalty in a given case will deter all potential future criminals who might otherwise commit similar crimes. The fact that R.P. had not seriously considered how or when the death penalty might serve such a deterrent purpose has little bearing on her ability to impose it. Indeed, having claimed that he struck R.P. because of her reluctance to vote for the death penalty, the prosecutor admitted after reviewing R.P.'s voir dire transcript that any reluctance he perceived "clearly [wasn't] from the words that are written down."

A number of other jurors whom the prosecution allowed to remain on the jury expressed similar views. "If, indeed, [R.P.'s] thoughts on [deterrence] did make the prosecutor uneasy, he should have worried about a number of . . . panel

34

members he accepted with no evident reservations." (*Miller-El*, *supra*, 545 U.S. at p. 244.)

Most of seated juror B.H.'s questionnaire answers regarding the death penalty were almost identical to those of R.P. He wrote that the death penalty is "necessary sometimes," that California should have the death penalty "to deter would-be criminals," and that the purpose of the death penalty was to be a "deterant [*sic*]." But he also said the death penalty would be inappropriate in cases where the defendant could be rehabilitated, writing: "Some people can be rehabilitated. Death penalty should not apply to those." He elaborated during voir dire: "I do believe in rehabilitation, I believe in that, that some people can be rehabilitated. I also believe that some people can't. So based on that kind of thinking that would allow me to go along with the death penalty in certain kinds of circumstances, and I don't have any canned ideas of what the circumstances would be. I would try to deal with it on a case by case basis." When asked during voir dire whether he would vote for death, B.H. responded: "Never having done it before I believe I could. Without having that experience, you know, it's kind of a hard thing to say, yeah, I definitely will, but I believe that I could do that if that's what I felt was necessary." This response is arguably more, and certainly not less, equivocal than R.P.'s succinct and direct response to the same question ("I feel I could").

Seated juror W.J. also gave responses that suggested at least as much reluctance to impose the death penalty as did those of R.P. In his questionnaire, W.J. wrote that life imprisonment was a more severe punishment than the death penalty, and he explained during voir dire: "[L]ife imprisonment, I think would just let the person, you know, just see how they really mess up, you know. I believe it would just be over with." These comments led the prosecutor to express "concern" that W.J. would impose "life in prison without the possibility of parole

35

because [he thought] that's worse than the death penalty." When asked by the prosecutor whether he would be able to "return the death penalty" if he came to the conclusion that it was "the appropriate verdict," W.J. responded: "Yes, I think so." After the prosecutor slightly rephrased the question, W.J. responded: "If that was the appropriate thing." These less than firm responses apparently were sufficient to dispel the prosecution's "concern" with respect to W.J.'s ability to impose the death penalty.

Seated juror W.C. also appears to have given the prosecution at least as much cause for concern as R.P. On his questionnaire, W.C. indicated that he did not know whether he would refuse to find the defendant guilty of first degree murder in order to avoid the issue of the death penalty. He also circled "no" in response to a question asking whether, if the trial reached the penalty phase, he "would automatically, in every case, regardless of the evidence, vote for the death penalty," but circled "don't know" in response to the question asking whether he would "regardless of the evidence, vote for life in prison without the possibility of parole." By contrast, R.P. answered "no" to both questions. During voir dire, when asked by defense counsel where on the spectrum he was between someone who would never impose the death penalty and someone who would impose it on all murderers, W.C. responded: "Probably split down the middle. I would want to hear all the circumstances and the evidence to determine, you know, if it was appropriate."

Finally, alternate juror D.V.'s views on the death penalty were somewhat equivocal. He wrote on his questionnaire and repeatedly stated in voir dire that he was "neither for nor against it." D.V. was definitive, however, in his belief that the death penalty was not a deterrent. When asked by the prosecutor, "Do you think the death penalty serves any deterrent value at all?" D.V. simply responded: "No."

36

## 2.

The record similarly belies the prosecutor's stated reasons for striking prospective juror R.J. As an initial matter, the court offers an implausible reading of the record when it suggests that the prosecutor, in striking R.J., likely believed it was striking D.J., another black woman with the same last name. (Maj. opn., *ante*, at pp. 34–37.) It is true that during the hearing on a motion for new trial that occurred 15 months after jury selection, the prosecutor mistakenly referred to D.J. in explaining his strike of R.J. Such a mistake is understandable, as the jury selection process was no longer fresh in the parties' minds, and at that point they had before them only the written record of the proceedings.

But there is no reason to think that the prosecution had made this same mistake 15 months earlier. R.J. was more than 25 years older than D.J., a significant difference that the prosecutor would have recognized when making peremptory challenges with all prospective jurors sitting before him in the courtroom. Moreover, if the prosecutor had actually believed that R.J. was D.J., he would have proceeded very differently. As the court observes, D.J. was emphatic in her opposition to the death penalty. (Maj. opn., *ante*, at pp. 36–37.) She wrote on her questionnaire, "I'm against the death penalty," and repeatedly suggested during voir dire that she would choose life without the possibility of parole over the death penalty no matter what evidence was presented at the penalty phase. During voir dire, the prosecutor said to her, "Clearly you don't believe in the death penalty," and she responded, "Right." For these reasons, the prosecutor made a motion to challenge her for cause, which the trial court denied only after prompting D.J. to affirm that she could impose the death penalty "if she felt the penalty was appropriate." Had the prosecutor believed that D.J. rather than R.J. was sitting in the jury box, in all likelihood he would have challenged her as soon as he could instead of accepting three panels on which she was seated. He also

37

would have given a different explanation for this strike. As noted, the prosecutor explained that he struck this juror because he did not believe she would be able to impose the death penalty, but that he did not "know how to exactly express it for the record." He further explained: "[S]ometimes you get a feel for a person that you just know that they can't impose it based upon the nature of the way that they something." Had he believed he was striking D.J. instead of R.J., he would have had no such difficulty describing his perception. He would have cited D.J.'s statements that she was against the death penalty, that she did not believe in it, and that she would choose life without the possibility of parole over the death penalty. Certainly, he would have mentioned that he had previously challenged D.J. for cause based on her inability to impose the death penalty. The fact that the prosecutor gave none of these obvious explanations confirms that he understood he was striking R.J.

There is little basis in the record to support the prosecutor's explanation for this strike. As the court admits, "R.J.'s written questionnaire generally expressed support for the death penalty." (Maj. opn., *ante*, at p. 33.) She indicated that the death penalty was not imposed too often, that she believed that this state should have capital punishment, and that she would like to serve as a juror in this capital case. She wrote that the death penalty is justified: "So that perpetrators and victims' families & friends could end experiences with finality. To let the punishment fit the crime." Her answers at voir dire confirmed her willingness to impose the death penalty. She answered "Yes, I would" when asked whether she would have the ability to return a death verdict if it was warranted.

The court concludes that some of R.J.'s questionnaire responses "contained qualifying language that can reasonably interpreted as showing equivocation or hesitation." (Maj. opn., *ante*, at p. 33.) But the court cites a number of responses that either display no such "equivocation or hesitation" or fail to distinguish her

38

from other jurors who were permitted to serve.  In the course of explaining why she believed that California should have the death penalty, R.J. said " 'the penalty would be *somewhat* of a solace to the friends, family of the victim.' "  (Maj. opn., *ante*, at p. 33, italics added by maj.)  The court does not explain how R.J.'s slight qualification of the degree to which the penalty would provide solace to the victim's family constituted a qualification of her support for the death penalty or her willingness to impose it.  Few would argue that the execution of a victim's killer would provide *complete* consolation for the victim's family or friends.

The court also observes that R.J. circled " 'agree somewhat' " (maj. opn., *ante*, at p. 33) in response to the statement:  "Anyone who intentionally kills another person without legal justification, and not in self-defense, should receive the death penalty."  The other available choices were "strongly agree," "strongly disagree," or "disagree somewhat."  As R.J. explained, she did not "strongly agree or disagree" with the statement, so "somewhat comes closest to any answer I could give at this point."  It is difficult to see why the court believes this response showed R.J.'s hesitancy to impose the death penalty.  Among the available options, "agree somewhat" was the answer that both demonstrated support for the death penalty and comports with California's capital punishment scheme, which does not provide that anyone who intentionally kills without legal justification will be sentenced to death.  (See Pen. Code, §§ 190.2, 190.3.)  Perhaps more importantly, it was also the answer circled by six of the 12 seated jurors.

The court also relies on the fact that R.J. indicated on her questionnaire that she did not know whether life in prison was a more severe punishment than the death penalty.  (Maj. opn., *ante*, at pp. 33–34.)  Even if this answer suggests reluctance to impose the death penalty, it did not distinguish her from a number of seated jurors, four of whom also circled "not sure" in response to this question and

39

another three of whom indicated that they believed that life imprisonment was actually a more severe punishment than the death penalty.

Finally, as with R.P., the court relies on R.J.'s comments regarding the deterrent value of the death penalty. On her questionnaire, R.J. wrote: "Capital punishment has never been a deterrent to crime but it is necessary in our society because so many people think it is." During voir dire, defense counsel asked her to elaborate on this statement, and she responded: "Oh, there is no elaboration on it. I just don't think that it is a deterrent to crime and that is based on the fact that there are so many people in jail for capital crimes." R.J.'s statements regarding deterrence provide little basis to question her willingness to impose the death penalty, especially since R.J. made clear her belief that capital punishment "is necessary in our society" even if it does not deter crime. That these comments were not cause for concern is further evidenced by the fact that the prosecutor never questioned R.J. regarding her beliefs about the deterrent value of the death penalty. In light of her expressed "support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." (*Miller-El*, *supra*, 454 U.S. at p. 244.)

Comments made by other prospective jurors whom the prosecutor did not strike provided a stronger basis to infer reluctance. As noted, seated juror B.H. said the death penalty should not be imposed on those who could be rehabilitated. When asked if he personally could vote to impose the death penalty, his response was more equivocal than R.J.'s straightforward answer to the same question ("Yes, I would"). Similarly, the record provides no reason to think that R.J. was any more hesitant than seated jurors W.J. and W.C., whose reservations about the death penalty have been discussed above. And if R.J.'s beliefs about the deterrent value of the death penalty were such a particular cause for concern, one would

40

have expected the prosecutor to have challenged alternate juror D.V., who flatly denied that the death penalty "serves any deterrent value at all."

## D.

In sum, a strong inference of purposeful discrimination arises from the pattern of the prosecutor's strikes of the first five black women in the jury box, from the uniformity, vagueness, and generality of the prosecutor's explanations, and from the questionnaire and voir dire responses of prospective jurors R.P. and R.J. considered by themselves and

in comparison with the responses of seated jurors. Any residual uncertainty about this conclusion attributable to a void in the record concerning R.P.'s and R.J.'s demeanor can hardly be construed against defendant when neither the trial court nor the prosecutor made a single specific observation about either juror's demeanor in support of the prosecutor's demeanor-based reason for his strikes. Because the void cannot be addressed by a remand more than two decades after the trial, defendant's conviction must be reversed. (See *Snyder*, *supra*, 552 U.S. at p. 486.)

This court has put itself on the wrong side of a split among federal and state courts on how to treat a trial court's denial of a defendant's *Batson* motion when the trial court has not made clear on the record that it considered all relevant circumstances bearing on the issue of purposeful discrimination in jury selection. A summary, unexplained denial in a case such as this does not indicate that the trial court understood and fulfilled its obligation to conduct the *Batson* inquiry with the degree of thoroughness and care demonstrated and required by *Snyder* and *Miller-El*. Under this court's approach, a *Batson* claim may be rejected even though *no court*, trial or appellate, has ever conducted a proper *Batson* step three analysis. In this case, such an analysis shows that with respect to at least two of the five black women struck, it was more likely than not that the prosecutor's strikes were impermissibly discriminatory. Thus, the jury that convicted defendant and sentenced to him to death was selected in a manner that violates the constitutional guarantee of equal protection of the laws.

I respectfully dissent.


LIU, J.


42

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Williams

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S030553
**Date Filed:** May 6, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Madge S. Watai

_____

**Counsel:**

Daniel N. Abrahamson, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, John R. Gorey, Jamie L. Fuster and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Daniel N. Abrahamson
918 Parker St., Bldg. A21
Berkeley, CA 94710
(510) 229-5212

Stephanie A. Miyoshi
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-8784